# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| THE TWELFTH CONGRESSIONAL DISTRICT REPUBLICAN COMMITTEE, BRIAN W. TUCKER, an individual voter and resident of Richmond County, CATHY A. LATHAM, a 2020 candidate for Presidential Elector, and EDWARD T. METZ, a 2020 candidate for Presidential Elector, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action File No. |
| v. | ) ) | |
| BRADFORD J. RAFFENSPERGER, in his official capacity as SECRETARY OF STATE OF GEORGIA; REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LEE, in their official capacities as Members of the Georgia State Election Board; and TIM MCFALLS, MARCIA BROWN, SHERRY T. BARNES, TERENCE DICKS, and BOB FINNEGAN, in their official capacities as Members of the RICHMOND COUNTY BOARD OF ELECTIONS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

THE TWELFTH CONGRESSIONAL DISTRICT REPUBLICAN

COMMITTEE, BRIAN W. TUCKER, CATHY A. LATHAM, and EDWARD T.

METZ, by counsel, file this Complaint alleging and asserting the following:

### NATURE OF THE CASE

1.      Pursuant to the mandate of Article II, § 1, cl. 2 and Article I, § 4 cl. 1

of the United States Constitution, the Georgia General Assembly enacted O.C.G.A.

§§ 21-2-382, 21-2-385, and 21-2-386.

2.      O.C.G.A. § 21-2-382 specifies how and where absentee ballots may

be delivered to county election officials.

3.      O.C.G.A. § 21-2-385(a) requires electors or certain authorized

representatives of electors to "personally mail or personally deliver [their absentee

ballots] to the board of registrars or absentee ballot clerk."

4.      O.C.G.A. § 21-2-386(a)(1)(B) requires that upon receipt of each

absentee ballot, a registrar or clerk must verify the elector's signature.

5.      O.C.G.A. § 21-2-386(a)(1)(G)(2) prohibits the opening of absentee

ballot envelopes before the polls open for a runoff election.

6.      O.C.G.A. § 21-2-386(a)(3) authorizes county election officials to

begin opening the inner envelope containing an absentee ballot and to begin

tabulating absentee ballots after the polls open on Election Day. That subsection also provides for monitoring of the tabulation of absentee ballots by designees of candidates.

7.     These statutes, which codify a specific and detailed procedure for requesting, delivering, processing, verifying and monitoring the tabulation of absentee ballots, are designed to protect Georgians from the universally acknowledged dangers of widespread mail-in absentee voting, which carries  a significant risk of election irregularities and vote fraud.[1]

8.     Specifically, mail-in absentee voting creates opportunities to obscure the true identities of persons fraudulently claiming to be legitimate electors and facilitates the collection of large quantities of purportedly valid absentee ballots by third-parties– commonly called "ballot harvesting" – that results in an extraordinary increase in the number of absentee ballots received by county election officials, including many that are not received and verified in accordance with the procedure required by applicable Georgia statutes.

9.     Without authorization from the Georgia General Assembly and despite the plain language of the applicable Georgia statutes to the contrary,

---

[1] Former President Jimmy Carter and Secretary of State James A. Baker, III, Co-chairs, *Building Confidence in U.S. Elections*, COMMISSION ON FEDERAL ELECTION at p.46, *available online at* https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf.

Defendants Secretary of State and the State Election Board ("SEB") promulgated and enforced new election rules and procedures that effectively override the requirements enacted by the General Assembly in O.C.G.A. §§ 21-2-382, 21-2-385 and 21-2-386. These new rules are SEB Rule 183-1-14-0.6-.14 (Exhibit A) and 183-1-14-0.9-.15 (Exhibit B). In addition, Defendant Raffensperger has issued a new procedural requirement regarding verification of absentee ballot signatures that eliminates the requirement of O.C.G.A. § 21-2-386(a)(1)(B) that the signature on the absentee ballot envelope matches both the signature on the application for an absentee ballot and the signature on the absentee voter's voter registration card. (Exhibit C).

10.     On information and belief, Defendant Raffensperger's office has instructed county election officials that they are not signature matching experts, which has the effect of discouraging election officials from undertaking the careful verification of absentee voter signatures required by O.C.G.A. § 21-2-386(a)(1)(B).

11.     These new rules allow absentee ballots to be delivered to unattended drop boxes by individuals other than relatives or members of the households of absentee ballot voters with no mechanism to ensure their legitimacy as required by §§ 21-2-382 and 21-2-385; allow county election officials to open absentee ballot

envelopes and scan absentee ballots beginning more than three weeks before Election Day in violation of § 21-2-386(a)(2); and allow absentee ballots to be processed without the verification of signatures required by § 21-2-386(a)(1)(B).

12.     Defendants Secretary of State and SEB will implement these new rules during the United States Senate run-off elections concluding on January 5, 2020.

13.     Plaintiffs seek prospective relief to: (a) invalidate SEB Rule 183-1-0.6-14 and prohibit the use of drop boxes for the receipt of absentee ballot envelopes in violation of O.C.G.A. § 21-2-385(a); (b) invalidate SEB Rule 183-1-14-0.9-.15 and prohibit the opening of absentee ballot envelopes before Election Day; and (c) invalidate Defendant Raffenperger's Official Election Bulletin regarding absentee ballot signature review guidance and order election officials to comply with the signature verification requirements of O.C.G.A. § 21-2-386(a)(1)(B).

### PARTIES

14.     Plaintiff THE TWELFTH CONGRESSIONAL DISTRICT REPUBLICAN COMMITTEE ("the 12th District Committee") is a Georgia unincorporated organization and the official Republican organization for the 12th Congressional District of the State of Georgia. It is committed to electing

candidates of the Republican Party who will advance the values and beliefs generally shared by Republican Party members. The 12th District Committee and its members will be directly harmed in future elections if SEB Rules 183-1-14-0.6-.14 and 183-1-14-0.9-.15 and the new verification procedure imposed by Defendant Raffensperger remain in force. This is because the 12th District Committee's right of free association and its right to equal treatment under the laws guaranteed by the United States and Georgia Constitutions will be violated. Under Defendants' new rules and procedures that facilitate ballot harvesting, the 12th District Committee's efforts to elect candidates of the Republican Party to office will be severely and negatively affected because those requirements will necessitate the diversion of the Committee's focus, energy and resources. *See* Declaration of Buck Moon, Chairman of the 12th District Committee (Exhibit D).

15.     Plaintiff BRIAN W. TUCKER is a resident of Richmond County and a registered voter of the State of Georgia. Mr. Tucker is a member of the Republican Party who voted in person in the November 2020 election and intends to vote in person in the January 2021 runoff elections. He has been injured by the disparate treatment that he receives as a registered voter who votes in person and is required to establish his personal identity with an officer of election before he is able to cast his vote, while absentee voters are allowed to vote without the same

scrutiny of personal identification under procedures established by Defendants Raffensperger and the SEB. As a member of the Republican Party, his right to freedom of association has been violated by Defendants by the new rules and procedures that facilitate ballot harvesting and vote fraud.

16.     Plaintiff CATHY A. LATHAM is a resident of Coffee County and a registered voter of the State of Georgia. She is a member of the Republican Party who voted early in person at the November 2020 election and intends to vote in person in future elections. She was selected in accordance with applicable Georgia law and the rules of the Georgia Republican Party to appear as a member of the Republican Presidential Elector Slate on the November 3, 2020 general election ballot. She intends to seek that office again in 2024. She has been injured by the disparate treatment that she receives as a registered voter who votes in person and is required to establish her personal identity with an officer of election before she is able to cast her vote, while absentee voters are allowed to vote without the same scrutiny of personal identification under the procedures established by Defendants Raffensperger and the SEB. As a member of the Republican Party and a member of the 12th Congressional District Republican Committee, her right to political association has been infringed by Defendants' new rules and procedures that facilitate ballot harvesting and vote fraud.

17.     Plaintiff EDWARD T. METZ is a resident and a registered voter of the State of Georgia. He voted early in person for the November 2020 election and intends to vote in person in future elections. He was selected in accordance with applicable Georgia law and the rules of the Georgia Libertarian Party to appear as a member of the Libertarian Presidential Elector Slate on the November 3, 2020 general election ballot. He intends to seek that office again in 2024. He has been injured by the disparate treatment that he receives as a registered voter who votes in person and is required to establish his personal identity with an officer of election before he is able to cast his vote, while absentee voters are allowed to vote without the same scrutiny of personal identification under procedures established by Defendants Raffensperger and the SEB. As a member of the Libertarian Presidential Elector Slate, his right to freedom of association has been infringed by the rules allowing delivery of absentee ballots to drop boxes and the opening of absentee ballot envelopes weeks before Election Day, as well as Defendant Raffensperger's directive regarding signature verification of absentee voters that eliminates the requirement that the signature on the ballot envelope match the signature in the voter registration file, which facilitates vote fraud.

18.     Defendant BRADFORD P. RAFFENSPERGER is sued in his official capacity as the Secretary of State of Georgia (hereinafter "Raffensperger" or the

"Secretary"). He is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the law or laws at issue in the suit." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Specifically, the Secretary is the chief elections officer of the State and is therefore responsible for the administration of the state laws affecting voting, including the absentee voting system. O.C.G.A. § 21-2-50(b). As Secretary of State, Mr. Raffensperger serves as the Chair of the State Election Board, which is the body responsible for ensuring uniform election practice in Georgia.

19.   Defendants BRADFORD P. RAFFENSPERGER, DAVID J. WORLEY, REBECCA N. SULLIVAN, MATTHEW MASHBURN, and ANH LEE, are members of the SEB responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." *Id.* at § 21-2-31(1). The State Election Board Members are responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at

§ 21-2-31(2). The State Election Board Members, personally and through the conduct of their employees, officers, agents, and servants, acted under color of state law at all times relevant to this action, and are sued for declaratory and injunctive relief in their official capacities.

20.     The Secretary of State and the SEB have the authority to direct the officials in each county who are responsible for administering elections (collectively "the county election officials"). As such, the SEB is the agency of the State of Georgia charged with the duties, among others, of promulgating rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections, and to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in the state.

21.     Defendants TIM MCFALLS, MARCIA BROWN, SHERRY T. BARNES, TERENCE DICKS, and BOB FINNEGAN (collectively the "Richmond Board"), are sued for declaratory and injunctive relief in their official capacities as members of the Richmond County Board of Elections.

## JURISDICTION AND VENUE

22.     Plaintiffs bring this action under the United States Constitution and under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution, as well as to vindicate their rights under Georgia law.

23.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the United States Constitution and laws of the United States.

24.     This Court also has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants Tim McFalls, Marcia Brown Sherry T. Barnes, Terence Dicks, and Bob Finnegan are residents in this District. Additionally, a substantial part of the events or omissions giving rise to the claim occurred in this District. The declaratory and injunctive relief sought by this action will enjoin the enforcement in this District of the illegally promulgated rules and deprive the Richmond County Board of any legal authority to enforce Defendants' new rules and procedures that have injured and will continue to injure Plaintiffs.

26.     This Court may grant declaratory relief pursuant to 28 U.S.C. § 2201 and 2202.

CONSTITUTIONAL FRAMEWORK

27.     The Elections Clause of the United States Constitution states: "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. CONST. art. I, § 4, cl. 1.

28.     The Electors Clause of the United States Constitution states:

[The President] shall . . . together with the Vice President, chosen for the same Term, be elected, as follows: Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . .

U.S. CONST. art. II, § 1, cl. 2.

29.     The "Legislature" of the State of Georgia is the Georgia General Assembly.

30.     Defendants are not part of the General Assembly and cannot exercise its powers.

31.     Because the United States Constitution reserves to the General Assembly the power to set the time, place, and manner of holding elections for Senators and Representatives, county boards of elections and state executive

officers have no authority to unilaterally exercise that power, much less to promulgate rules that conflict with existing legislation.

32.    Defendants' new rules and procedures that are in direct conflict with the unambiguous requirements of O.C.G.A. §§ 21-2-382, 21-2-385 and 21-2-386 affect the "time, place, and manner of holding elections for Senators and Representatives" and will apply in future Presidential elections, they violate both the Electors and the Elections Clauses of the United States Constitution.

33.    Independent of the Electors and Elections Clauses, Defendants' new rules and procedures violate Plaintiffs' rights to freedom of association and the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

## STATEMENT OF FACTS AND LAW

### DEFENDANTS' NEW RULE AND PROCEDURES

**Allowing Early Opening of Absentee Ballot Envelopes**

34.    Defendants promulgated SEB Rule 183-1-14-0.9-.15 (Processing Absentee Ballots Prior to Election Day), which directly conflicts with the requirement in O.C.G.A. § 21-2-386(a)(2) that absentee ballots shall not be opened until Election Day.

35.     That rule authorizes county election officials to open envelopes containing absentee ballots as early as three weeks before Election Day, to remove the absentee ballots, and to scan the ballots.

36.     By separating the ballots from the envelopes, the ability to track the absentee ballot with the signature on the accompanying inner envelope is compromised, thereby precluding the required verification that the absentee ballot is submitted by a voter qualified to participate in the election.

**Installation of Unattended Drop Boxes**

37.     On August 11, 2020, Defendants Raffensperger and the SEB adopted Rule 183-1-14-0.6-.14 authorizing the use of drop boxes in order to provide, as the rule states, "a means for absentee by mail electors to deliver their ballots to the county registrars."

38.     By this rule, Defendant SEB permitted and encouraged the installation and use of unattended drop boxes within Georgia's counties as a means for delivery of absentee ballots.

39.     SEB Rule 183-1-14-0.6-.14 claims that a drop box "shall be deemed delivery pursuant to O.C.G.A. § 21-2-385."

40.    This rule's definition of delivery is in direct conflict with the language of O.C.G.A. § 21-2-385, which the Georgia General Assembly amended in 2019 specifically to prohibit ballot harvesting.

41.    O.C.G.A. § 21-2-385 now specifies only two options for the submission of an absentee ballot: "the elector shall then personally mail or personally deliver the same to the board of registrars or absentee ballot clerk . . . ."

42.    O.C.G.A. § 21-2-382(a) establishes the precise locations where an election official may receive an absentee ballot from the individual voter or their family member. These sites are defined as "additional registrar's offices or places of registration."

> Any other provisions of this chapter to the contrary notwithstanding, the board of registrars may establish additional sites as additional registrar's offices or places of registration for the purpose of receiving absentee ballots under Code Section 21-2-381 and for the purpose of voting absentee ballots under Code Section 21-2-385, provided that any such site is a branch of the county courthouse, a courthouse annex, a government service center providing general government services, another government building generally accessible to the public, or a location that is used as an election day polling place, notwithstanding that such location is not a government building.

43.    O.C.G.A. § 21-2-2(27) defines a "polling place" to mean "the room provided in each precinct for voting at a primary or election."

44.     O.C.G.A. § 21-2-382(b) provides that in larger population areas, such as Fulton, DeKalb, Gwinnett, and Cobb counties, the following sites would automatically serve as additional receiving locations for absentee ballots:

> any branch of the county courthouse or courthouse annex established within any such county shall be an additional registrar's or absentee ballot clerk's office or place of registration for the purpose of receiving absentee ballots . . . under Code Section 21-2-385.

45.     A drop box is not included in the list of additional reception sites described in the exercise in O.C.G.A. § 21-2-382(a) and (b) and is not within the meaning of a "registrar's office or places of registration" in O.C.G.A. § 21-2-386

46.     A "registrar's office or places of registration" contemplates a building with staff capable of receiving absentee ballots and verifying the signature as required by the procedures prescribed in § 21-2-386.

47.      A drop box cannot be deemed a location to apply for an absentee ballot "in person in the registrar's or absentee ballot clerk's office" as prescribed by § 21-2-381 nor can it be a location for an elector to appear "in person" to present the absentee ballot to the "board of registrars or absentee ballot clerk," as prescribed by § 21-2-385.

48.     Pursuant to O.C.G.A. § 21-2-380.1, only the absentee ballot clerk can perform the functions or duties prescribed in the Election Code. The absentee

ballot clerk "may be the county registrar or any other designated official who shall perform the duties set forth in this article."

49.    Throughout the Georgia Election Code, the legislature clearly contemplated a staffed office or building for voter registration, receipt of absentee ballot applications, and receipt of absentee ballots so that the voter can deliver the ballot "in person" or through their designated statutory agent. *E.g.,* O.C.G.A. § 21-2-385.

50.    Drop boxes make it easier for political activists to conduct ballot harvesting to gather votes. Because there is a break in the chain of custody of those authorized by statute to collect and deliver absentee ballots, which produces opportunities for political activists to submit fraudulent absentee ballots, the opportunity for illicit votes to be counted is significantly increased.

51.    The continued use of drop boxes will significantly affect the way in which the 12th District Committee and the individual Plaintiffs conduct their activities because it forces them to modify their campaign appeal to the electorate in order to garner and enhance the support for their candidates under the changed circumstances and to redirect their focus, energy and resources to counter ballot harvesting.

52.     The break in the chain of custody caused by the use of drop boxes not only hinders the 12th District Committee's ability to advance its political interests by inevitably forcing a redirection of its focus and message, as well as the need for to secure greater resources, but it also increases the chances that an absentee voter will cast his or her vote under the improper influence of another individual and enhances opportunities for ballot theft or submission of illicitly generated absentee ballots to the detriment of the 12th District Committee, its candidates, and its adherents in the election.

53.     While Burke, Taliaferro, Columbia and Warren counties did not install drop boxes, Richmond County installed five drop boxes, Jefferson County three, McDuffie County two, and Warren, Glascock, and Lincoln Counties one.

54.     On information and belief, county election officials plan to install more drop boxes within their respective jurisdictions.

**Verifying Absentee Elector's Signatures**

55.     O.C.G.A. § 21-2-386(a)(1)(B) requires that upon receipt of each absentee ballot, a registrar or clerk must compare the elector's signature or mark on the oath on the absentee ballot envelope with the elector's voter registration card or the most recent update to such card and application for absentee ballot to determine

if the elector's signature is correct and, if so, certify that fact by signing or initialing the name of the registrar or clerk below the elector's oath.

56.    In many instances during the 2020 general election, registrars and clerks failed to perform the required signature verification.

57.    Once absentee ballots are separated from the envelopes in which they were sealed, the required matching of the signatures on the envelopes with the signatures on the absentee ballot applications and the voters' signatures in the voter registration file will not allow for the disqualification of the absentee ballot, if indicated, because the ballot can no longer be linked to the envelope.

58.    In Defendant Raffensperger's May 1, 2020 Official Election Bulletin, county election officials (Exhibit C) were instructed to conduct the verification of absentee ballot signatures as follows:

> If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks.

59.    The foregoing instruction is in direct conflict with the requirement in O.C.G.A. § 21-2-386(A)(1)(B) that the signature of an absentee voter must be compared against both the voter's signature or mark on his or her registration card and on the application for the absentee ballot:

The registrar or clerk shall then compare the identifying information on the oath with the information on file in his or her office, shall compare the signature or mark on the oath with the signature or mark on the absentee elector's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or mark, and shall if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath.

60.     Because signature verification of every absentee elector's signature is essential to prevent the counting of illicit or fraudulent absentee ballots, Defendants must conduct signature verification as required by O.C.G.A. § 21-2-386(a)(1)(B) for every absentee ballot received and not as instructed by Defendants Raffensperger and the SEB.

61.     All of the allegations contained in this Complaint are incorporated and realleged in each of the following counts below as may be required and as if restated therein.

## COUNT I
### (All Defendants)
### Violation of Article I, § 4, cl. 2 of the United States Constitution

62.     Article I, § 4, cl. 2 of the United States Constitution confers on the legislature of each of the States the power to regulate the "Times, Places, and Manner of holding Elections for Senators and Representatives."

63.     O.C.G.A. § 21-2-31 permits the Secretary of State and the SEB the authority to promulgate rules "consistent with" the laws of this State.

64.     SEB Rules 183-1-14-0.6-.14 and 183-1-14-0.9-.15 promulgated by the Secretary of State and the SEB and the new signature verification requirements ordered by Defendant Raffensperger conflict directly with O.C.G.A. §§ 21-2-382, 21-2-385, and 21-2-386 and are beyond the authority conferred on Defendants by O.C.G.A. § 21-2-31.

65.     Accordingly, Defendants have violated Article I, § 4, cl. 2 by usurping power granted solely to the Georgia General Assembly.

66.     Plaintiffs will suffer particularized injury as a result of Defendants' violations of Article I, § 4, cl. 2 in the form of blatantly unequal treatment as voters and monitors of vote counting who are associated with the Libertarian and Republican parties when compared to the treatment received by similarly situated individuals associated with the Democratic Party and by the denial of their right of freedom of association.

### COUNT II
**(All Defendants)**
**Violation of Article II, § 1, cl. 2 of the United States Constitution**

67.     Article II, § 1, cl. 2 confers exclusive power on state legislatures to appoint Presidential electors in the manner chosen by the state legislators.

68.    SEB Rules 183-1-0.6-14 and 183-1-14-0.9-.15 promulgated by the

Secretary of State and the SEB directly conflicts with O.C.G.A. § 21-2-385. The

promulgation of that rule is beyond the authority granted by O.C.G.A. § 21-2-31.

69.    Plaintiffs will suffer particularized injury as a result of Defendants'

violations of Article I, § 4, cl. 2 in the form of blatantly unequal treatment as voters

and monitors of vote counting who are associated with the Libertarian and

Republican parties when compared to the treatment received by similarly situated

individuals associated with the Democratic Party and by the denial of their right of

freedom of association.

## COUNT III
### (All Defendants)
### Violation of the First Amendment's Right to Freedom of Association

70.    Plaintiffs' right to vote is a function of their right to associate freely

with other individuals who share a common set of political beliefs and who intend

to advance those beliefs by electing candidates who represent those beliefs.

71.    Plaintiffs have the right to have their votes counted in a reliable

manner without discount or cancellation.

72.    Defendants' adoption of procedures that conflict with Georgia statutes

designed to assure that every absentee voter is qualified to vote and that enable

numerous absentee voters to vote illegally effectively discounts and cancels the

votes of the individual Plaintiffs and injures the 12th District Committee in its efforts to persuade the electorate and elect its candidates by necessitating the diversion of focus, energy and resources from activities that the 12th District Committee would otherwise undertake to efforts to counter or minimize the consequences of the ballot harvesting that is facilitated by Defendants' new rules and procedures.

73.     Plaintiffs' right to associate freely with others who share their political values and beliefs is protected by the First and Fourteenth Amendments. Their right to vote is a function of that right. The individual Plaintiffs have a right to have their votes counted if lawful in a reliable manner without discount or cancellation. But the right to vote is but a part of the political activity that the First Amendment protects.

74.     The First Amendment guarantees citizens and political parties the right to express their messages to the voters at large or to targeted groups of voters in support of their candidates and to choose the methods for doing so that they consider best calculated to achieve success.

75.     SEB Rules 183-1-0.6-14 and 183-1-14-0.9-.15, the drop boxes, and Defendant Raffensperger's new requirement regarding verification of absentee ballot signatures have the unavoidable effect of causing Plaintiffs to alter their

message to voters, to reallocate resources, and to redirect their focus and energy during a political campaign.

76.     Defendants' new rules and procedures increase the likelihood that illicit absentee ballots will be included in the final and total count in future elections because it results in the chain of custody of absentee ballots by persons authorized by O.C.G.A. § 21-2-385 being broken.

77.     The risk of counting illicit ballots that is enhanced by the lack of required signature verification, the break in the chain of custody attributable to the use of drop boxes, and the extraordinary increase in the volume of drop-off ballots that the new rule facilitates, which results in inadequate scrutiny of the identity of those who submit absentee ballots due to the sheer number of ballots to be reviewed and the time available to verify the voters' signatures.

78.     Under Article II, § 1, cl. 2 of the United States Constitution, when the Georgia General Assembly exercises the power to appoint Presidential electors, the other provisions of the United States Constitution must be complied with, including the Free Speech and Freedom of Assembly Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

79.     The new procedures and requirements that Defendants and county election officials will continue to follow contrary to the plain language of

O.C.G.A. §§ 21-2-382, 21-2-385, and 21-2-386 cause Plaintiffs, particularly the 12th District Committee, to alter their political message, campaign focus, and allocation of resources to respond to the effects of Defendants' unauthorized actions that enable Democratic Party officials, candidates, and activists, as well as other individuals and organizations, to flood county election officials with mail-in/drop-off absentee ballots which are not processed under the safeguards provided by the above-referenced Georgia statutes.

80.     By substantially expanding the number of potential voters who submit ballots in an election cycle without properly and lawfully enforcing the statutory requirements governing voter participation, Defendants have negatively affected the 12th District Committee's ability to use its resources effectively to support its candidates.

81.     The acknowledged potential of widespread election fraud that Defendants facilitate by funding unattended drop boxes, declining to verify the identity of every absentee voter, and permitting the opening of absentee ballot envelopes weeks before an election, thereby enhancing opportunities for illegal vote harvesting, forces the 12th District Committee to redirect its focus, energy and resources to minimize the risk of election fraud at the expense of reaching voters with its message and conducting voter contact programs.

## COUNT IV
### (All Defendants)
### Violation of the Equal Protection Clause

82.     The procedure established by Defendants Raffensperger and the SEB for confirming the identity of an absentee voter is different and far less rigorous than the procedure that they have established to confirm the personal identification of each in-person voter. The disparate treatment of the individual Plaintiffs who vote in person when compared to the treatment of absentee voters resulting from the new unauthorized procedures and requirements is a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

83.     The disparate treatment of the 12th District Committee and its designated monitors who were prevented from observing vote counting and signature verification when compared to the treatment of Democrats similarly appointed violates the 12th District Committee's right to equal application of the laws by Georgia officials, which is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

84.     Defendants were acting under color of Georgia law in promulgating SEB Rules 183-1-14-0.6-.14 and 183-1-14-0.9-.15 and in issuing the new requirement regarding signature verification, each of which rule and requirement is in direct conflict with the applicable Georgia statutes.

## COUNT V
### (All Defendants)
### Violation of the Georgia Constitution and Statutes

85.     Under the law of the State of Georgia, public officials exercise only those powers expressly conferred on them by the Constitution of Georgia or statutes enacted by the General Assembly.

86.     Article II, § 1 of the Georgia Constitution that elections "shall be conducted in accordance with procedures provided by law."

87.     O.C.G.A. § 21-2-31 reaffirms the legislature's prerogative that the SEB may only promulgate rules that are "consistent with law".

88.     The Richmond County Board of Elections may only promulgate rules "consistent with law" pursuant to O.C.G.A. § 21-2-70.

89.     Defendants Bradford Raffensperger and SEB exceeded their delegated authority by promulgating SEB Rules 183-1-14-0.6-.14 and 183-1-14-0.9-.15 and by Defendant Raffensperger's imposition of the requirement on county election officials in his Official Election Bulletin regarding absentee ballot signature review guidance. Each of those actions is in direct conflict with laws enacted by the General Assembly concerning the handling of absentee ballots and the envelopes in which they are submitted.

90.     Defendants on the Richmond County Board of Elections likewise exceeded their delegated authority by enforcing SEB Rules 183-1-14-0.6-.14 and 183-1-14-0.9-.15 and by applying Defendant Raffensperger's signature verification directive.

91.     The promulgation and enforcement of SEB Rules 183-1-14-0.6-.14 and 183-1-14-0.9-.15 and the issuance of the Official Election Bulletin directive by Defendants violated Plaintiffs' rights under Georgia law by imposing an unlawful burden on their exercise of the right to vote and the right to be free from arbitrary action by government officials.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

(a)     Entry of an Order and Judgment declaring that Rules 183-1-14-0.9-.15 and 183-1-14-0.6-.14 and Defendant Raffesperger's new instruction in his Official Election Bulletin to county election officials regarding signature verification of absentee ballot voters are invalid as violative of Art. I, § 4, cl. 1 and Art. II, § 1, cl. 2 of the United States Constitution and the applicable statutes of the State of Georgia;

(b)     Entry of an Order and Judgment declaring that the enforcement of SEB Rules 183-1-14-0.6-.14 and 183-1-14-0.9-.15 and Defendant Raffensperger's

new instruction in his Official Election Bulletin to county election officials regarding signature verification of absentee ballot voters results in disparate treatment of Plaintiffs who vote in person when compared to those voters who vote by absentee ballot, thereby burdening Plaintiffs' right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment;

(c)     Entry of an Order temporarily, preliminarily, and permanently enjoining Defendants to direct county election officials to verify each absentee ballot signature; to allow properly designated monitors to have reasonable and meaningful opportunity to observe the signature verification process and the ballot tabulation process; and to prohibit Defendants from utilizing and authorizing and utilizing drop boxes for the collection of absentee ballot envelopes;

(d)     Retain jurisdiction and maintain the *status quo* of the procedures clearly established by the Georgia Code until completion of the runoff elections on January 5, 2020;

(e)     Entry of an Order and Judgment awarding Plaintiffs their attorneys' fees and costs under 42 U.S.C. § 1988; and

(f)     Any other and further relief that this Court deems equitable under the circumstances.

Respectfully submitted,

**THE 12TH CONGRESSIONAL DISTRICT REPUBLICAN COMMITTEE, BRIAN W. TUCKER, CATHY A. LATHAM, and EDWARD T. METZ**

/s/    Johnny Vines
Johnny Vines, Esq.
Georgia Bar Number: 940633
JOHNNY VINES, P.C.
404 Durden Street, Suite B
Vidalia, Georgia 30474
(912) 388-7071 (o)
jecvines@vineslaw.com

Patrick M. McSweeney, Esq.*
Robert J. Cynkar, Esq.*
Christopher I. Kachouroff, Esq.*
MCSWEENEY, CYNKAR & KACHOUROFF, PLLC
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
(703) 621-3300 (o)
patrick@mck-lawyers.com
rcynkar@mck-lawyers.com
chris@mck-lawyers.com

*Counsel for Plaintiffs*

* *Pro Hac Vice* Applications Forthcoming

## VERIFICATION

I, Buck Moon, a citizen of the United States and a resident of the State of Georgia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of December 2020.

_____

Garland Moon, Jr., Chairman

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2020, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record. However, because no counsel has entered an appearance in this matter, I also certify that I caused a true and correct copy of the foregoing and all attachments in the above captioned matter to be sent via email notification to the parties who are not yet served via email (and FedEx on December 9) as follows:

**Secretary of State Bradford P. Raffensperger**
214 State Capitol
Atlanta, Georgia 30334
brad@sos.ga.gov
soscontact@sos.ga.gov

**Rebecca N. Sullivan**
Georgia Department of Administrative Services
200 Piedmont Avenue SE
Suite 1804, West Tower
Atlanta, Georgia 30334-0910
Rebecca.sullivan@doas.ga.gov

**David J. Worley**
Evangelista Worley, LLC
500 Sugar Mill Road
Suite 245A
Atlanta, Georgia 30350
david@ewlawllc.com

**Matthew Mashburn**
Aldridge Pite, LLP
3575 Piedmont Road, N.E.
Suite 500
Atlanta, Georgia 30305
mmashburn@aldridgepite.com

**Anh Lee**
Harley, Rowe & Fowler, P.C.
2700 Cumberland Parkway
Suite 525
Atlanta, Georgia 30339
ale@hrflegal.com

**Tim McFalls**
**Marcia Brown**
**Sherry T. Barnes**
**Terence Dicks**
**Bob Finnegan**
Richmond County Board of Elections
535 Telfair Street Suite 500
Augusta, GA  30901
Phone: 706-821-2340
Fax: 706-821-2814
RichmondElections@augustaga.gov

This 9th day of December, 2020.

/s/  Johnny Vines
Johnny Vines, Esq.
JOHNNY VINES, P.C.
404 Durden Street, Suite B
Vidalia, Georgia 30474
(912) 388-7071 (o)
(912) 537-6600 (f)
jecvines@vineslaw.com

**RULES
OF
STATE ELECTION BOARD**

**CHAPTER 183-1
GEORGIA ELECTION CODE**

**SUBJECT 183-1-14
ABSENTEE VOTING**

**TABLE OF CONTENTS**

183-1-14-0.8-.14 Secure Absentee Ballot Drop Boxes

**RULE 183-1-14-0.8-.14 Secure Absentee Ballot Drop Boxes**

(1) County registrars are authorized to establish one or more drop box locations as a means for absentee by mail electors to deliver their ballots to the county registrars. Placing a voted absentee ballot into the drop box shall be deemed delivery pursuant to O.C.G.A. § 21-2-385 and is subject to the limitations on who may deliver a ballot on behalf of an elector.

(2) A drop box shall only be located on county or municipal government property generally accessible to the public.

(3) Drop box locations may open beginning 49 days Election Day prior to any presidential preference primary, general primary other than a municipal general primary, general election other than a municipal general election, or special primary or special election in which there is a candidate for federal office on the ballot and the drop boxes for the aforementioned elections shall close at 7:00 p.m.  For a statewide or federal special election or a statewide or federal runoff election, drop box locations may begin opening on the first day of advance voting.  On Election Day, every drop box shall be closed and ballots collected at 7:00 p.m.  Prior to opening a drop box for a new election, the registrar shall ensure that the drop box is empty. Any person acting on behalf of the registrar who opens a drop box prior to an election must have sworn an oath in the same form as the oath for poll officers set forth in O.C.G.A. § 21-2-95 prior to opening the drop box and shall sign a form indicating that the drop box was empty and secure at the time of opening. Counties shall provide notice of the location of each drop box by posting such information on the home page of the county election website no later than the day the drop boxes are placed in a location.

(4) Drop box locations must have adequate lighting and use a video recording device to monitor each drop box location. The video recording device must either continuously record the drop box location or use motion detection that records one frame, or more, per minute until detection of motion triggers continuous recording.



EXHIBIT
A

(5) Video recordings of the drop box locations must be retained by the county registrars for 30 days after the final certification of the election, or until conclusion of any contest involving an election on the ballot in the county jurisdiction, whichever is later, and shall be made available to Secretary of State investigators upon request or to the public, upon request, as soon as possible or at a charge that is not cost prohibitive to the public, if there is a charge.

(6) A drop box shall be constructed of durable material able to withstand vandalism and inclement weather. The opening slot of a drop box shall not allow ballots to be tampered with or removed and shall be designed to minimize the ability for liquid to be poured into the drop box or rain water to seep in.

(7) A drop box shall be securely fastened to the ground or an immovable fixture.

(8) If the drop box utilizes a drop-slot into a building, the ballots must drop into a locked container, and both the drop-slot and the container must be monitored by video recording devices.

(9) A drop box shall be clearly labeled "OFFICIAL ABSENTEE BALLOT DROP BOX". Each drop box location shall clearly display signage developed by the Secretary of State regarding Georgia law related to absentee ballot harvesting and destroying, defacing, or delaying delivery of ballots.

(10) Prior to the second Monday before Election Day, the county registrars must arrange for collection of the ballots from each drop box at least once every 72 hours. Beginning on the second Monday before Election Day and up until 7:00 p.m. on Election Day, the county registrars must arrange for collection of the ballots from each drop box location at least once every 24 hours. On Election Day, every drop box shall be closed and ballots collected at 7:00 p.m. Collection of ballots from a drop box must be made by a team of at least two people. Any person collecting ballots from a drop box must have sworn an oath in the same form as the oath for poll officers set forth in O.C.G.A. § 21-2-95. The collection team shall complete and sign a ballot transfer form upon removing the ballots from the drop box, which shall include the date, time, location and number of ballots. After emptying the drop box on 7:00 p.m. on Election Day, the collection team shall close the drop box and indicate on the ballot transfer form that the drop box was emptied and closed. The ballots from the drop box shall be immediately transported to the county registrar and processed and stored in the same manner as absentee ballots returned by mail are processed and stored. The county registrar or a designee thereof shall sign the ballot transfer form upon receipt of the ballots from the collection team.

Authority: O.C.G.A. §§ 21-2-31, 21-2-386

**RULES**
**OF**
**STATE ELECTION BOARD**

**CHAPTER 183-1**
**GEORGIA ELECTION CODE**

**SUBJECT 183-1-14**
**ABSENTEE VOTING**

**TABLE OF CONTENTS**

183-1-14-0.9-.15 Processing Absentee Ballots Prior to Election Day

**RULE 183-1-14-0.9-.15 Processing Absentee Ballots Prior to Election Day**

(1) Beginning at 8:00 a.m. on the third Monday prior to Election Day, county election superintendents shall be authorized to open the outer envelope of accepted absentee ballots, remove the contents including the absentee ballot, and scan the absentee ballot using one or more ballot scanners, in accordance with this rule, and may continue until all accepted absentee ballots are processed. All county election superintendents shall begin processing absentee ballots no later than the second Monday before Election Day. However, no person shall tally, tabulate, estimate or attempt to tally, tabulate or estimate or cause the voting equipment to produce any tally or tabulation, partial or otherwise, of the absentee votes cast until the time for the closing of the polls on Election Day.

(2) Absentee ballots shall be processed in batches of not more than 100. At least three persons who are registrars, deputy registrars, poll workers, or absentee ballot clerks must be present at all times during the processing of a batch of absentee ballots.

(3) Outer envelopes shall be opened in such a manner as not to destroy the oath and signature of the voter.

(4) All outer envelopes in a batch shall be counted and recorded on a reconciliation form prior to opening the outer envelopes of a batch. Upon opening the outer envelopes of a batch, the contents shall be removed in a manner that ensures that the contents of the envelope cannot be matched back to the outer envelope. Once all of the outer envelopes of a batch have been opened and the contents removed, the inner envelopes and/or secrecy sleeves shall be opened and the absentee ballots removed. Once all of the absentee ballots have been removed, the number of ballots shall be counted and recorded on a reconciliation form and compared to the original count of outer envelopes in the batch. Any discrepancy shall be investigated and recorded on a reconciliation form. The form shall be signed by the officials processing the batch of ballots. The absentee ballots shall then be scanned on a ballot scanner. A batch number assigned by the ballot scanner shall be recorded on the reconciliation form for that batch. Any ballot that is so torn, bent, or otherwise defective that it cannot be processed by the scanner shall be duplicated pursuant to O.C.G.A. § 21-2-483. Vote review panels shall be established, as needed, to adjudicate any rejected ballots per O.C.G.A. § 21-2-483 and Rule

EXHIBIT
B

183-1-15-.02. Once successfully scanned, the batch of ballots shall be bound together with the reconciliation form (or a copy thereof) and the official who scanned the ballots shall notate on the reconciliation form that the batch has been scanned, including the date and location of the scanning, and initial the notation. The scanned absentee ballots shall then be secured in a container. More than one batch of scanned absentee ballots may be placed in the container, but the individual batches must be separately bound. A security seal shall be placed on the container. The batch number(s), the number of scanned absentee ballots in each batch, and the security seal number shall be recorded on the container.

(5) If the county election superintendent chooses to prepare and/or scan absentee ballots prior to Election Day according to this Rule, the superintendent shall notify the Secretary of State in writing at least seven days prior to processing absentee ballots.

(6) The proceedings described in this rule shall be open to the view of the public, but no person except one employed and designated for the purpose by the superintendent shall touch any ballot or ballot container. The state executive committee of each political party and political body having candidates whose names appear on the ballot in such county shall have the right to have two properly designated persons present to act as monitors for such process and each independent and nonpartisan candidate whose name appears on the ballot in such county shall have the right to have one properly designated person present to act as a monitor for such process. The designated monitors shall be given a letter by the designating entity containing the name of the monitor, his or her address, and the county in which he or she may monitor the process. A copy of the letter designating the monitor shall be delivered to the county elections superintendent prior to the monitor being allowed to monitor the process. Each monitor shall wear a name tag indicating their name and the entity that designated them while monitoring the process. Any other observer shall be required to wear a name tag that indicates their name and that they are a public observer. The superintendent may make reasonable regulations, including regulations regarding social distancing measures and required personal protective equipment, that designated monitors and observers shall follow so that they do not interfere in any way with the processing of ballots or conduct of the election. If a monitor or observer interferes with the processing of the ballots or conduct of the election after being duly warned by an election official or superintendent, or if he or she violates any of the prohibited activities in this rule, the superintendent may revoke the person's designation to monitor the process, remove them from any further monitoring or observing, and refer the incident to the Secretary of State's office for investigation. Any infraction or irregularity observed by a monitor or observer shall be reported to the superintendent or to the Secretary of State. No person whose name is on the ballot shall be eligible to serve as a designated monitor.

(7) While viewing the process set forth in this rule, monitors and observers are prohibited from:
    (a) In any way interfering with the processing of absentee ballots or conduct of the election;
    (b) Using or bringing in to the room any photographic or other electronic monitoring or recording devices, cellular telephones, or computers;
    (c) Engaging in any form of campaigning or campaign activity;
    (d) Taking any action that endangers the secrecy and security of the ballots;

(e) Touching any ballot or ballot container;

(f) Tallying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast; and

(g) Communicating any information that they see, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other than to an election official who needs to such information to lawfully carry out his or her official duties.

(8) Before being allowed to view the process set forth in this rule, each designated monitor and observer shall execute an oath swearing or affirming, under penalty of perjury, that they understand the prohibitions set forth above, that they will not engage in any prohibited activity, and that they understand any violations of this rule will be punishable by the State Election Board.

(9) The county election superintendent shall publish a written notice, containing the dates, start and end times, and location(s) where absentee ballots will be processed and any rejected ballots will be adjudicated. Such notice shall be posted in the superintendent's office, on the home page of the county election website, and sent to the Secretary of State's office at least seven days prior to scanning ballots in accordance with this rule. The Secretary of State shall publish on his website the information he receives from counties stating the dates, times and locations where absentee ballots will be processed and adjudicated.

(10) Any person involved in processing absentee ballots according to this rule shall swear an oath, in the same form as the oath for poll officers set forth in O.C.G.A. § 21-2-95, prior to beginning the processing of absentee ballots.

(11) All cell phones, laptops, audio or video recording devices, and other communication devices shall be prohibited from the room where processing of absentee ballots is taking place, except for county election computers necessary to carry out this rule or otherwise conduct the election. No information concerning the tally of votes, or any partial tally of votes, shall be communicated until the time for the closing of the polls on Election day.

(12) The county superintendent shall be permitted to designate locations where public observers may view the process described in this rule to protect the security and secrecy of the ballots. Monitors designated by political parties, political bodies, and independent and non-partisan candidates shall be allowed to monitor the process described in this rule, but they must do so in a way that does not interfere with election officials. The superintendent may designate locations that allow designated monitors to monitor the process set forth in this rule, and such locations shall include areas that allow credentialed monitors to view the batching of the ballots, reconciliation of envelopes to ballots, scanning the ballots, duplication of ballots, adjudication of ballots by vote review panels, sealing the ballots after scanning, and other such areas as the superintendent may deem necessary to the assurance of fair and honest procedures in the carrying out of the procedures set forth in this rule.

Authority: O.C.G.A. § 21-2-31.



# OFFICIAL ELECTION BULLETIN

May 1, 2020

---

**TO:  County Election Officials and County Registrars**

**FROM: Chris Harvey, State Elections Director**

**RE:  Absentee Ballot Signature Review Guidance**

---

Verifying that a voter's signature on his or her absentee ballot matches his or her signature on the absentee ballot application or in the voter registration record is required by Georgia law and is crucial to secure elections. Ensuring that signatures match is even more crucial in this time of increased absentee voting due to the COVID-19 crisis. The purpose of this OEB is to remind you of some recent updates to Georgia law and regulations regarding verifying signatures on absentee ballots and to make you aware of the procedures that should be followed when a signature on an absentee ballot does not match. HB 316, which passed in 2019, modified the absentee ballot laws and the design of the oath envelope. The State Election Board also adopted Rule 183-1-14.13 this year, which addresses how quickly and by what methods electors need to be notified concerning absentee ballot issues. What follows are the procedures that should be followed when the signature on the absentee ballot does not match the voter's signature on his or her application or voter registration record:

> **County registrars and absentee ballot clerks are required, upon receipt of each mail-in absentee ballot, to compare the signature or mark of the elector on the mail-in absentee ballot envelope with the signatures or marks in eNet and on the application for the mail-in absentee ballot. If the signature does not appear to be valid, registrars and clerks are required to follow the procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C).**

Page 1 of 3

**EXHIBIT**

**C**

When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot.[1] If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks.

A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application. If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under OCGA 21-2-386(a)(1)(C). Then, the registrar or absentee ballot clerk shall commence the notification procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C) and State Election Board Rule 183-1-14-.13.

---

[1] Once the registrar or clerk verifies a matching signature, they do not need to continue to review additional signatures for the same voter.

Page **2** of **3**

RULE 183-1-14-.13 Prompt Notification of Absentee Ballot Rejection

When a timely submitted absentee ballot is rejected, the board of registrars or absentee ballot clerk shall send the elector notice of such rejection and opportunity to cure by mailing written notice, and attempt to notify the elector by telephone and email, if a telephone number or email is on the elector's voter registration record or absentee ballot application, no later than the close of business on the third business day after receiving the absentee ballot.  However, for any timely submitted absentee ballot that is rejected within eleven days of Election Day, the board of registrars or absentee ballot clerk shall send the elector notice of such rejection and opportunity to cure by mailing written notice, and attempt to notify the elector by telephone and email, if a telephone number or email is on the elector's voter registration record or absentee ballot application, no later than close of business on the next business day.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | |
|---|---|
| THE TWELFTH CONGRESSIONAL DISTRICT REPUBLICAN COMMITTEE, et al., | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action File No. |
| | ) |
| BRADFORD J. RAFFENSPERGER, et al, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF GARLAND MOON, JR.

I, Garland Moon, Jr., declare the following pursuant to 28 U.S.C. § 1746.

1.     I am a registered voter of the State of Georgia residing in Toombs

County.

2.     I currently serve as the Chairman of the 12th Congressional District

Republican Committee (the District Committee"), which is the official Republican

organization for this district.

3.     The District Committee raises funds to advance its mission; recruits

candidates; plans political activities; hires consultants, staff and other personnel;

purchases political advertising, campaign signs and other political materials; and



undertakes other functions to advance Republican policies, principles and candidates.

4.      In recent years, ballot harvesting has become a principal focus of the Democratic Party and its allies at all levels of election activity in Georgia.

5.      Ballot harvesting involves the collection of absentee ballots by individuals other than the absentee voter for submission to county election officials.

6.      In 2005, a federal bipartisan commission concluded that the practice of allowing absentee and other mail-in or drop-off ballots poses the largest threat of election fraud. *See* Former President Jimmy Carter and Secretary of State James A. Baker, III, Co-chairs, 2005 Bi-Partisan Report of the Commission on Federal Election Reform, Commission on Federal Election at p.46 available at https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c297 66256.pdf.

7.      The use of drop boxes for the collection of absentee ballots, as the Georgia Secretary of State and the Georgia State Election Board have authorized, facilitates ballot harvesting by enabling individuals who are not relatives or members of the absentee voter to collect an absentee ballot and deposit it in a drop box, which is not attended or otherwise effectively monitored by county election officials or other government personnel.

8.      Ballot harvesting is also facilitated by the absence of the verification required by Georgia statute that the ballot submitted is that of a registered voter who is eligible to vote by absentee ballot.

9.      The practice of ballot harvesting by Georgia Democrats and their allies, such as the New Georgia Project, has become so aggressive in recent election cycles that Georgia Republicans have concluded that they must respond to that increasing practice to minimize the likelihood of election fraud which results in the counting of illegal ballots and which may alter the outcome of elections.

10.     The District Committee will compelled out of political necessity to forego or reduce donations to Republican candidates, as well as the provision of other support for Republican candidates, such as door-to-door canvassing and other voter contact activities, in order to undertake and fund activities that identify and counter illegal ballot harvesting activities.

11.     My review of the ballot harvesting activities by Georgia Democrats and their allies during the 2020 election cycle has demonstrated the need for the District Committee to heighten its attention to ballot harvesting activities that have contributed to the unprecedented increase in the number of absentee ballots counted in elections.

12.     Instead of funding consultants and vendors to assist the District Committee with public opinion surveys, direct contact with voters, and production

of campaign materials, the District Committee will be compelled to devote more of its resources to labor-intensive activities to counter the illicit collection of absentee ballots by monitoring drop boxes, the signature verification process, and other activities associated with ballot harvesting.

13.    I make this declaration based on my personal knowledge, information, and belief under penalty of perjury.

Dated: December 9, 2020

**Garland Moon, Jr.**