**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| **THE TWELFTH CONGRESSIONAL DISTRICT REPUBLICAN COMMITTEE,** *et al.* | ) ) | |
| | ) | **Civil Action No.** |
| **Plaintiffs,** | ) | **1:20-cv-00180-JRH-BKE** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BRADFORD J. RAFFENSPERGER,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**STATE DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**</u>

Defendants Bradford J. Raffensperger, Georgia Secretary of State ("the Secretary"), and State Election Board members Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (collectively, "State Defendants") submit the following Consolidated Brief in Support of their Motion to Dismiss and Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction[1]:

## <u>INTRODUCTION</u>

Plaintiffs ask this Court to intervene in an ongoing election and alter rules *currently in use* by local elections officials for the receipt and processing of absentee ballots for the January 5, 2020, Runoff Election ("Runoff"). Plaintiffs attack rules of the State Election Board ("SEB"), as well as guidance provided by the Secretary, adopted months before the Runoff.

---

[1] On December 14, defendants were ordered to respond to Plaintiffs' emergency motion "and any other relevant motion" by 9:00pm on December 15.  Plaintiffs were ordered to perfect service by 9:00pm on December 14.  Plaintiffs failed to serve or to seek *or* obtain a waiver from the State Defendants prior to the filing of this response and motion on December 15, 2020.

Plaintiffs' Motion for a Temporary Restraining Order or Preliminary Injunction (Doc. 2) should be denied and their claims should be dismissed for several reasons. Plaintiffs lack standing to pursue their claims. This Court also should abstain from granting the relief requested. Plaintiffs have not met the standards for the grant of a preliminary injunctive relief, and their Complaint fails to state any claim upon which relief may be granted.  Plaintiffs have also failed to serve any of the State Defendants with valid service of process.

## **FACTUAL BACKGROUND**

In 2019, the Georgia General Assembly enacted HB 316, a bipartisan effort to reform the state's election code and implement a new electronic voting system. The reforms kept in place Georgia's "no excuse" absentee voting, maintained safeguards by requiring signature verification of both absentee ballot applications and absentee ballots while providing voters the opportunity to cure any signature issues with their absentee ballot, and limited the persons that may mail or deliver an absentee ballot on an elector's behalf. *See* O.C.G.A. §§ 21-2-385 and -386.

The State Election Board ("SEB") has the duty to "promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections…" O.C.G.A. § 21-2-31(1). SEB Rule 183-1-14-0.8.14 ("Secure Absentee Drop Boxes) (hereinafter the "Drop Box Rule") was first adopted at the SEB's February 28, 2020 meeting.[2] Minor revisions not affecting the substance of the rule were adopted July 1, 2020, and November 23, 2020. *Id*. SEB Rule 183-1-14-0.9-.15 ("Processing Absentee Ballots Prior to Election Day") (hereinafter the "Processing Rule") was adopted at the SEB's July 1, 2020 meeting, with minor non-substantive revisions made to the rule at the SEB's November 23, 2020 meeting. *Id*.

---

[2] *See* https://sos.ga.gov/index.php/elections/state_election_board

Plaintiffs also challenge guidance provided by the Secretary to county election officials detailing the process that local registrars and clerks should use in conducting absentee ballot signature reviews. *See* Exhibit A, Harvey Declaration ("Harvey Decl."), ¶5; Exhibit 1 to Harvey Decl. ("May 2020 OEB"). On December 9, 2020, the Secretary issued another bulletin ("December 2020 OEB"), advising local election officials that the signature verification process is open to the public and reaffirming that local officials must follow the signature verification requirements set forth in Georgia law. *See* Harvey Decl., ¶8; Exhibit 2 to Harvey Decl. ("December 2020 OEB").

### A.    The "Drop Box Rule" Does Not Permit "Ballot Harvesting."

O.C.G.A. § 21-2-385 provides that an elector that chooses to vote an absentee ballot may either mail or deliver their absentee ballot to the board of registrars or absentee ballot clerk. The Drop Box Rule authorizes county registrars to establish one or more drop box locations as a means for electors to deliver absentee ballots to the county registrars. It sets forth measures designed to prevent ballot tampering or removal, and requires that any drop box established by county registrars must have adequate lighting *and* use a video recording device for monitoring.

Plaintiffs' Complaint and Motion presume, without offering any evidence, that the "Drop Box Rule" somehow facilitates a practice known as "ballot harvesting." "Ballot harvesting" is defined by Plaintiffs as "the collection of large quantities of purportedly valid absentee ballots by third-parties." (Compl., ¶ 8). Plaintiffs theorize (without citation to any evidence) that the Drop Box Rule would permit ballot harvesting by "allow[ing] absentee ballots to be delivered to unattended drop boxes by individuals other than relatives or members of the households of absentee ballot voters…" (Compl. ¶11). Plaintiffs offer no explanation as to why they believe that a drop box operated by a county registrar, set up to prevent tampering or removal and

monitored by video recording, would somehow be more susceptible to ballot harvesting than would a standard (and unmonitored) mail collection box operated by the U.S. Postal Service.

O.C.G.A. § 21-2-385 prohibits ballot harvesting by preventing unauthorized third parties from mailing or delivering an elector's absentee ballot. O.C.G.A. § 21-2-385(a) provides that a ballot may be mailed or delivered only by the elector or by specifically enumerated persons that the Legislature has determined are appropriate persons to mail or deliver an absentee ballot on the elector's behalf.[3] The Drop Box Rule does not alter these requirements; it expressly reaffirms them by providing that "[p]lacing a voted absentee ballot into the drop box shall be deemed delivery pursuant to O.C.G.A. § 21-2-385 and is subject to the limitations on who may deliver a ballot on behalf of an elector." SEB Rule 183-1-14-0.8-.14(1).  Furthermore, violations of the Election Code provision against ballot harvesting *do not* invalidate an absentee ballot otherwise *lawfully cast* but delivered in violation of that safeguard; instead, it subjects the individual who *engages in the collection and delivery* of those ballots to the sanctions available to the State Election Board upon determination of a violation.  *Cf.* O.C.G.A. § 21-2-386(a)(1)(C) (providing exclusive grounds for rejecting an absentee ballot) with O.C.G.A. § 21-2-33.1(a) (providing for sanctions available to the SEB for violations of the Georgia Election Code).

### B.    The Processing Rule Does Not Conflict or Interfere With the Signature Verification Process.

The Processing Rule permits county election superintendents to open the outer envelope of accepted absentee ballots and scan the ballots into ballot scanners – but to not count, tally or tabulate such ballots – prior to Election Day. The Processing Rule was enacted in order to prevent excessive delays in the counting of the overwhelming volume of absentee ballots that

---

[3] O.C.G.A. § 21-2-385(a) sets forth who can possess an absentee ballot for delivery.

were expected in light of the COVID-19 pandemic, and was in effect for both the November 3, 2020 General Election and the upcoming January 5, 2020 Runoff Election.

The Processing Rule allows county election superintendents to begin opening envelopes and scanning **accepted** absentee ballots into scanners as early as 8:00 a.m. the third Monday prior to Election Day. Ga. Comp. R. & Regs. 183-1-14-.09-.15(1).  Plaintiffs have speculated that this Rule could cause harm by "precluding the required [signature] verification that the absentee ballot is submitted by a voter qualified to participate in the election." (Compl. ¶ 36). However, the Rule specifically applies only to "accepted absentee ballots," meaning that the signature verification process has already taken place *prior* to scanning.

### C.   The May 2020 OEB Does Not Conflict With Georgia's Election Code or Permit Ballot Harvesting.

Plaintiffs also challenge the May 2020 OEB, which provides guidance to County Election Officials and County Registrars on how to properly conduct absentee ballot signature reviews. O.C.G.A. § 21-2-386(a)(1)(B) provides that upon receiving an absentee ballot, a local registrar or clerk shall "compare the signature or mark on the oath" with the signature on the voter registration card (or the most recent update and absentee ballot application). If the signature "does not appear to be valid," the registrar or clerk is to reject the ballot and promptly notify the elector of the rejection. O.C.G.A. § 21-2-386(a)(1)(C). The statute does not set forth any particular standard or process for a registrar or clerk to employ in determining whether a signature does or does not "appear to be valid."

The May 2020 OEB provides guidance to registrars and clerks as to how to make this determination. It provides that if the registrar or clerk determines that the voter's signature on the ballot does not match the voter's signature on file, the registrar or clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. If a majority of the registrars,

deputy registrars, or absentee ballot clerks agree that the signatures do not match, the ballots should be rejected and the clerk should then commence the notification procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C).

Plaintiffs claim that the May 2020 OEB's guidance will cause them harm "in the form of blatantly unequal treatment as voters and monitors of vote counting who are associated with the Libertarian and Republican parties when compared to the treatment received by similarly situated individuals associated with the Democratic Party…". (Compl., ¶ 66). However, the May 2020 OEB's guidance applies to all absentee ballots cast in the State of Georgia. There are no differences in treatment for an absentee ballot cast by a Democratic, Republican, or Libertarian voter. In fact, because the signatures that are verified are located on the sealed outer envelope of an absentee ballot, (*see* O.C.G.A. § 21-2-385(a)), the verifying officials are unable to determine how an absentee ballot's votes are cast at the time of the verification.

Further, there has been no detectable effect on the absentee ballot rejection rate conducted using the process set forth in the May 2020 OEB guidance when compared to the rejection rate in the last general election in 2018. An analysis undertaken of the number of absentee ballot rejections for signature issues during the November 3, 2020, General Election as compared to the 2018 General Election found that the rejection rate for absentee ballots with missing or non-matching signatures in the 2020 general election was 0.19%, comparable to the rejection rate for signature issues in 2018. *See* Harvey Decl. ¶¶ 6-7.

## ARGUMENT AND CITATION OF AUTHORITY

I.    **The Court Lacks Jurisdiction over the Action Because Plaintiffs Cannot Establish Article III Standing.**

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. In finding that an individual voter lacked

standing to raise some of the very same claims made by Plaintiffs here, the Eleventh Circuit Court of Appeals cautioned that "our limited jurisdiction" is one of the "most fundamental principles of the federal courts." *Wood v. Raffensperger*, 2020 U.S.App. LEXIS 37971 at \*10 (11th Cir. Dec. 5, 2020). Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Id.* (citations omitted). Therefore, "[w]hen someone sues in federal court, he bears the burden of proving the suit falls within our jurisdiction." *Id.* at \*10-11.

A party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As an irreducible constitutional minimum, Plaintiffs must show they have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 561. As the party invoking federal jurisdiction, Plaintiffs bear the burden at the pleadings phase of "clearly alleg[ing] facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

## A. Plaintiffs Have Not Alleged an Injury That is Concrete, Particularized, and Actual or Imminent Regarding the Treatment of Absentee Ballots.

Plaintiffs have failed to plead that any of them have suffered, or will suffer, a concrete injury that might establish Article III standing with regard to any actions taken by the State Defendants. Injury in fact is the "first and foremost" of the standing elements. *Spokeo*, 136 S. Ct. at 1547. An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020); *see also Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 U.S. App. LEXIS 35639 at \*16 (3d Cir. Nov. 13, 2020) ("To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests.").

7

The alleged injury must be "distinct from a generally available grievance about government." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). The federal judiciary's "refusal to serve as a forum for generalized grievances has a lengthy pedigree. . . . [A] generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing. *Lance v. Coffman*, 549 U.S. 437, 440– 41 (2007). The plaintiff in *Wood*, like Plaintiffs here, based standing on his interest in "ensur[ing that] … only lawful ballots are counted" which the 11th Circuit held insufficient to establish standing. 2020 U.S.App. LEXIS 37971 at *12. As in *Wood*, the Plaintiffs here cannot explain "how [their] interest in compliance with state election laws is different from that of any other person." *Id.* at *13.

Nor have any of the Plaintiffs established a harm that is "certainly impending." "[W]hen Plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Jacobson*, 974 F.3d at 1245-46 (*citing Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). Allegations of possible future injury are insufficient. *Clapper*, 568 U.S. at 409. As the *Jacobson* court noted, the fact that an election is rapidly approaching is insufficient to establish a certainly impending injury. 974 F.3d at 1252.

In finding that President Trump's reelection campaign, the Republican National Committee, and various Republican congressional candidates all lacked standing to maintain a strikingly similar suit, the District Court for the Western District of Pennsylvania found that fears that ballot drop boxes lacked security or that the Pennsylvania Secretary of State had issued improper guidance on signature matches were insufficient to demonstrate a "certainly impending" injury. *Donald J. Trump for President, Inc. v. Boockvar*, 2020 U.S.Dist. LEXIS 188390 at *17-18. The district court found that there was no "concrete" injury as any potential "fraud hasn't yet occurred, and there is insufficient evidence that the harm is "certainly

impending." *Id.* at *104. It was, therefore, not enough to allege that "theoretical bad actors **might** intentionally 'target' a drop box as the 'easiest opportunity for voter fraud' or that failing to conduct signature analysis "open[s] the door to the potential for massive fraud through a mechanism already susceptible to voter fraud," since these concerns were "based solely on a chain of unknown events that may never come to pass." *Id.* at *106-7 (emphasis in original).

The same is true here. Plaintiffs' claims are based on nothing more than the mere possibility that theoretical bad actors might stuff drop boxes with *lawfully cast* ballots that were delivered in a way that subjects the deliverer to potential sanction *or* that elections workers might improperly discharge their signature matching duties. These concerns are based solely on a chain of unknown events that may never come to pass. As such, these are not concrete and particularized injuries to Plaintiffs, and none of them have standing to pursue these claims.

Plaintiffs claim that they have standing because the individual plaintiffs "were and will in the future be candidates to serve as Presidential electors." Disregarding the fact that they are not candidates in the Runoff, they cite *Roe v. State of Alabama by & through Evans*, 43 F.3d 574, 579-80 (11th Cir. 1995) for the proposition that "candidates for office showed particularized injuries." (Doc. 2 at p. 14). However, the *Wood* court rejected a similar attempt to use *Roe* as the court "did not address standing in *Roe*, so that precedent provides no basis for Wood to establish standing." 2020 U.S.App. LEXIS at *16. Plaintiffs have no legal or factual support upon which to base a claim that they have sustained a concrete and particularized injury, and their Motion must therefore be denied and their claims dismissed for lack of standing.

**B.   Plaintiffs Have Not Alleged Any Injuries Traceable to the State Defendants.**

Not only have Plaintiffs failed to demonstrate an injury in fact, they cannot satisfy the causation requirement of standing, which requires that "a plaintiff's injury must be 'fairly

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson*, 974 F.3d at 1253 (citation omitted). Plaintiffs offer no credible explanation as to how any injury they claim to have suffered would be traceable to any action of the State Defendants. Plaintiffs offer the Declaration of Garland Moon, but, he claims that "my review of the ballot harvesting activities *by Georgia Democrats and their allies* during the 2020 election cycle has demonstrated the need for the District Committee to heighten its attention to ballot harvesting…" *See* Moon Decl., ¶ 11, 12 (emphasis added). The "injuries" Moon describes, to the extent they exist, would have been caused by third parties engaged in ballot harvesting, not by State Defendants.

Because Plaintiffs have not articulated any injury caused by any act of the State Defendants, but have offered only speculation about theoretical injuries caused by intervening third party bad actors, they have alleged no injury that is traceable to the State Defendants. Their Motion must therefore be denied and their claims against the State Defendants must be dismissed for lack of standing.

## II.   This Court Should Abstain from Granting Plaintiffs' Requested Relief and Dismiss Their Complaint.

The United States Constitution gives States the power to set the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. That power "is matched by state control over the election process for state offices." *Clingman v. Beaver*, 544 U.S. 581, 586 (2005).  Nevertheless, Plaintiffs seek to have this court usurp Georgia's powers and change its election rules in the middle of an election.  Specifically, Plaintiffs' Complaint centers around Georgia's Election Code and Rules promulgated by the Secretary of State and the State Election Board: Rules that have now been in place *for three completed elections* at this juncture.  The issues Plaintiffs raise in their Complaint are not new to

Georgia's courts—both state and federal—and are as meritless here as they have been in previously decided litigation.

### A. This Court should abstain from granting relief under *Purcell v. Gonzalez* because the election process is already underway

The election that Plaintiffs seek to change Georgia's rules for has already begun.  Early voting for the Runoff began on December 14, 2020, and numerous absentee ballots have been printed, mailed, and returned.  Yet, Plaintiffs ask this Court to change Georgia's election rules midstream.  This Court should not be willing to do so.

The Supreme Court has "caution[ed] against federal courts mandating new election rules—especially at the last minute." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *See also Democratic Nat'l Comm. v. Wis. State Legis.*, 592 U.S. ___, Slip Op. at 2 (2020) (J. Kavanaugh concurring in denial of application to vacate stay) (explaining that the Supreme Court "has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election—a principle often referred to as the *Purcell* principle.").

In this case, however, Plaintiffs are not asking this Court to change Georgia's elections rules on the eve of an election.  They are asking for something much worse: that this Court change Georgia's elections rules *in the middle of an election*.  In support of such an unprecedented request, Plaintiffs allege that the rules violate the Elections and Electors Clauses of the United States Constitution, their First Amendment rights, the Equal Protection Clause, and Georgia's Constitution and Statutes.  However, even in the face of such unproven allegations, this Court must still refrain from granting Plaintiffs' requested relief because Georgia is currently in the middle of an election.  *See Purcell*, 549 U.S. at 3-6 ("Given the imminence of the election

and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed without an injunction suspending the voter identification rules.").

Moreover, in another Georgia election case just two months ago, the Eleventh Circuit granted State Defendants' motion to stay a district court's injunction that altered Georgia's elections rules.  *New Ga. Project v. Raffensperger*, 976 F.3d at 1284.  In concluding that a stay of the injunction was appropriate, the Eleventh Circuit reasoned that "we are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell's* well-known caution against federal courts mandating new election rules—especially at the last minute."  *Id*. at 1283 (citing *Purcell*, 549 U.S. at 4-5). In light of the direction from both the Supreme Court and the 11th Circuit against changing a state's election rules on the eve, or as here in the midst, of an election, this Court should decline Plaintiffs' request to change Georgia's elections rules during the conduct of the January 5, 2021, Runoff where: 1) absentee ballots have already been printed and mailed; 2) early in-person voting has already begun; and  3) over 200,000 absentee ballots have already been returned, signature matched, and accepted by local election officials.  Accordingly, this Court should abstain from granting the relief sought by Plaintiffs and dismiss Plaintiffs' complaint.

**B.**   **This Court should abstain from granting Plaintiffs' relief under the *Pullman* and *Colorado River* Doctrines.**

The relief that Plaintiffs seek is nothing short of halting the ongoing January 5, 2021 runoff election for Georgia's two open U.S. Senate seats, change the election framework on the fly, and restarting an already commenced electoral process.  There are numerous problems with this proposed relief. First, it violates the principles of federalism. Second, the *Pullman* doctrine warrants dismissal. Finally, and at the very least, this lawsuit should be stayed pending the outcome of state election challenges pursuant to the *Colorado River* doctrine.

On federalism, the Eleventh Circuit recently held that it is "doubtful" that a federal court could compel a state to promulgate a regulation. *Jacobson v. Fla. Sec'y of State*, 974 F.3d F. 3d 1236 1257 (11th Cir. 2020). First, federal courts are only able to order State Defendants from "refrain[ing] from violating federal law." *Id.* (citing V*a. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011)). Much of Plaintiffs' proposed relief cannot be reconciled with this binding precedent. Specifically, Plaintiffs do not seek to just refrain the State Defendants, but they also seek to compel them to, in essence, establish new rules binding at least 158 entities that are not party to this litigation in regards to verifying absentee ballot signatures, monitors observing the signature verification and ballot tabulation processes, and the use of absentee ballot drop boxes. The relief sought is particularly offensive to federalism principles in light of the fact that the Runoff is ongoing and there are pending election challenges in Georgia state court that significantly mirror the claims brought in this lawsuit.[4] It is hard to imagine a more significant challenge to federalism than for a party to come to federal court asking it to reverse a state's election rules passed in accordance with that state's laws without giving the state's courts an opportunity to weigh in on them in a currently pending case in its own court system.

These concerns are recognized by the *Pullman* doctrine, which provides that "a federal district court is vested with discretion to decline to exercise or to postpone the exercise of its jurisdiction in deference to state court resolution of underlying issues of state law." *Harman v. Forssenius*, 380 U.S. 528, 534, (1965) (citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 (1941)). The need to abstain under the *Pullman* doctrine arises and is proper "[w]here resolution of the federal constitutional question is dependent upon, or may be materially altered

---

[4] *See, e.g., Republican Nat'l Comm.. v. Raffensperger,* 2020cv343319 (Fulton Superior Ct., filed Dec. 8, 2020) (seeking declaratory, injunctive, and mandamus relief as to observers and the absentee ballot verification process and the operation and use of secure ballot drop boxes).

by, the determination of an uncertain issue of state law, . . . in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Harman*, 380 U.S. at 534. Here, the constitutional issue presented—whether the legislature's delegation of rulemaking authority to the SEB is valid, and whether the SEB exceeded that authority when promulgating various emergency rules—violates the federal constitution. In other words, the Court cannot answer the constitutional question without first deciding that the state agency exceeded its authority under *state law*. This is a classic *Pullman* situation, which examines and requires that "(1) the case presents an unsettled question of state law, and (2) the question of state law is dispositive of the case or would avoid, or substantially modify, the constitutional question presented." *Rindley v. Gallagher*, 929 F. 2d 1552, 1554-55 (11th Cir. 1991) (Citing *Duke v. James*, 713 F.2d 1506, 1510 (11th Cir. 1983). Assuming *arguendo* that this Court believes that there is a question as to whether the acts of the State Election Board and the Secretary exceeded their delegated authority, this Court should decline to grant relief under *Pullman*.

For a similar reason, Plaintiffs' requested relief violates the *Colorado River* Doctrine. There are numerous pending challenges to the November election that have properly been filed in Georgia's courts, including one filed late on December 4, 2020, by outgoing President Donald Trump.[5] Although these cases are directed at the November 3, 2020 presidential election while this one is directed at the January 5, 2021 runoff election for Georgia's two open senate seats, they raise identical claims as the Plaintiffs raise here. Specifically, both the state court election contest involving Trump and this one involve questions pertaining to signature verifications

---

[5] *Donald J. Trump, et al. v. Raffensperger, et al*, 2020cv343255 (Fulton Superior Ct., filed December 4, 2020).

rules, access to the tabulation and verification process, the use of drop boxes, and whether the

Secretary of State and the SEB exceed their authority in passing certain rules. In situations

similar to these, the Eleventh Circuit has indicated that a stay of federal proceedings is warranted

under the *Colorado River* doctrine, which "authorizes a federal 'district court to dismiss or stay

an action when there is an ongoing parallel action in state court.'" *Moorer v. Demopolis*

*Waterworks & Sewer Bd.*, 374 F.3d 994, 997–98 (11th Cir. 2004) (citing *LaDuke v. Burlington*

*Northern Railroad Co.*, 879 F.2d 1556, 1558 (7th Cir.1989)).

Factors considered in the *Colorado River* analysis include: the desire to "avoid piecemeal

litigation," whether state or federal law governs the issue, and whether the state court can protect

all parties' rights. *Id*. at 987 (citation omitted).  Each of these factors warrants staying the

litigation. The bulk of Plaintiffs' complaint addresses issues of state law: how absentee ballot

requests and ballots are inspected and the authority of the General Assembly to delegate

authority to the SEB and the Secretary. Moreover, the state court election challenges are to move

swiftly. Thus, the possibility of piecemeal litigation is real and concrete. Finally, the relief that

the parties in the state court challenges can obtain would protect all parties' rights. The remedies

available to Georgia courts when ruling on election challenges are spelled out in state law.  *See*

O.C.G.A. § 21-2-527(d). Under these circumstances, *Colorado River* factors are satisfied, and

the election challenge should proceed in state court while this Court abstains.

## III.    Plaintiffs' Motion Fails to Satisfy the Preliminary Injunction Factors.

In order to prevail on a motion for temporary restraining order or preliminary injunction,

the movant must show: (1) a substantial likelihood of prevailing on the merits; (2) that the

plaintiff will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to

the movant outweighs whatever damages the proposed injunction may cause the opposing party;

and (4) the injunction would not be adverse to the public interest. *Duke v. Cleland*, 954 F.2d 1526, 1529 (11th Cir. 1992). A preliminary injunction is a drastic remedy "which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974). Because Plaintiffs are seeking a mandatory injunction, which are particularly disfavored, the burden is further heightened, and Plaintiff must show that the facts and the law *clearly* favor him. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

**A. Plaintiffs are not substantially likely to succeed on the merits.**

*1. Plaintiffs' claim under the Electors and Elections Clauses fails.*

The Electors Clause of the United States Constitution refers to Presidential electors; it has no bearing on an election for United States Senators. It provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors," who, in turn, cast votes for president. U.S. Const. art. II, § 1, cl. 2. Plaintiffs fail to show how any purported violation of this clause is relevant to the Runoff Election for United States Senators.

While the Elections Clause does apply to elections for Senators, Plaintiffs fail to show how State Defendants have violated that clause, which provides that "[t]he Times, Places, and Manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Plaintiffs contends that the State Defendants have usurped the power of the legislature by "promulgat[ing] rules that conflict with existing legislation." (*See, e.g.* Compl. ¶31). However, the State Election Board has the authority, delegated by the legislature, "[t]o formulate, adopt, and promulgate such rules and regulations … as will be conducive to the fair, legal, and orderly conduct of primaries and elections" so long as those rules are "consistent with law." O.C.G.A. 21-2-31(2). Plaintiffs'

16

claim depends on the assumption that the rules and guidance resulting from the Litigation Settlement are inconsistent with Georgia's election code. They are not.

The Drop Box Rule does not conflict with Georgia's election code, which provides that an absentee ballot shall be "mailed or delivered" either personally by the elector or by one of the persons authorized by the statute to mail or deliver a ballot on the elector's behalf. O.C.G.A. § 21-2-385. The statute does not define how one is to deliver a ballot to the board of registrars or absentee ballot clerk, and the Drop Box Rule adds detail to undefined term "deliver" during a global pandemic and a state-declared Public Health Emergency.

Similarly, the Processing Rule does not conflict with Georgia's statutory prohibition against tabulating absentee ballots prior to Election Day. While O.C.G.A. § 21-2-386 does prohibit tabulating votes prior to Election Day, the Processing Rule does not provide for any tallying, tabulating, or estimating the votes cast by absentee ballot. It provides only for elections officials to take preliminary ministerial action to open envelopes and scan images of ballots that can later be used in tabulating, in order to prevent a prolonged delay in announcing elections results. This does not conflict with the Georgia Legislature's definition of the time, place, or manner of conducting an Election, but merely facilitates the ability of county officials to be able to tabulate the votes in a timely fashion on Election Day.

Nor does the May 2020 OEB conflict with any provision of the Georgia elections code. When an absentee ballot is defective because of a signature mismatch, the statute provides that "[t]he board of registrars or absentee ballot clerk shall promptly notify the elector of such rejection, [and] a copy of [that] notification shall be retained in the files of the board of registrars or absentee ballot clerk." O.C.G.A. § 21-2-386(a)(1)(C). Once notified, the elector has the opportunity to "cure" any defects so the ballot may be counted. *See id.* The May 2020 OEB

guidance merely elaborates on that procedure. If the clerk determines that a signature does not match, the clerk "must seek review from two other … absentee ballot clerks," and a ballot will only be rejected if a majority of the consulted clerks agree that the signatures do not match. (*See* Compl., Exhibit C.) If the ballot is rejected, the clerk writes the names of the reviewing officials on the face of the ballot, along with the reason for the rejection. *Id.* These types of procedures might add detail to the statutory scheme, but they do not supplant or contradict the text of the statute.  That is exactly the conclusion reached by the Northern District of Georgia less than one month ago when deciding a similar challenge to the signature verification procedure.  The consent agreement, promulgated SEB rule, and Secretary issued guidance do "not override or rewrite state law.  [They] simply add[] an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot is rejected. … Defendants' actions … sought to achieve consistency among the county election officials in Georgia, which *further [Plaintiffs']* stated goals of conducting 'free, fair and transparent public elections.'" *Wood v. Raffensperger*, 2020 U.S. Dist. LEXIS 218058 , *31 (emphasis in original), *aff'd* 2020 U.S. App. LEXIS 37971 (11th Cir. 2020).

The Georgia Administrative Procedure Act, O.C.G.A. §§ 50-13-1 through 50-13-44, specifically provides a framework for the General Assembly to review and acquiesce in the rules promulgated by regulatory bodies such as the State Election Board. O.C.G.A. § 50-13-4. The Drop Box Rule received final approval on February 28, 2020, and May 2020 OEB was issued on May 1, 2020. The General Assembly signaled its favorable acceptance of the Rule and the May 2020 OEB by making *no* efforts to legislatively reject said rule or OEB prior to its final adjournment on June 26, 2020. The General Assembly took *no* action to reverse or modify the State Election Board's rules prior to the commencement, or during the pendency, of the 2020

18

election cycle, and Plaintiff fails to make any cognizable claim that the State Election Board or the Secretary's actions violate state law.

> 2. *Plaintiffs' First Amendment claims fail because they cannot show any undue burden on their right to vote.*

Plaintiffs cite no specific authority for the proposition that the Rules or the guidance implicate a burden upon the right to vote that is protected by the First Amendment. They cite generally to the *Anderson-Burdick* framework that balances a burden on the voter with a state's interest in the voting regulation. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008); *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1318-19 (11th Cir. 2019).

Plaintiffs' First Amendment claim does not even implicate *Anderson-Burdick*, because they fail to articulate how the SEB Rules or the May 2020 OEB affect their right to vote. The Drop Box Rule, the Processing Rule, and the May 2020 OEB guidance are facially neutral, and Plaintiffs do not explain how either places an undue burden upon their right to vote.

In rejecting claims regarding absentee ballot drop boxes that are nearly identical to those made by Plaintiffs here, the United States District Court for the Northern District of Illinois recently found that the provision of drop boxes did not create any potential "ballot harvesting" injury to any rights protected by the First and Fourteenth Amendments. *Cook Cty. Repub. Party v. Pritzker*, 2020 U.S.Dist. LEXIS 170442, *24 (N.D. Ill. Sept. 17, 2020). Like Georgia, Illinois permitted election authorities to establish "secure collection sites for the postage-free return of vote by mail ballots." *Id.* at *23. Plaintiffs sued to enjoin the use of the drop boxes, claiming that the use of drop boxes would somehow lead to an increased risk of ballot harvesting. The Court recognized that Illinois law defined what persons could lawfully return an absentee ballot, and stated that "the provision of a secure drop box says nothing to change who may place the ballot in a secure drop box …Therefore, contrary to Plaintiff's argument, the Election Code does not

permit just anyone to return the voter's ballot." *Id.* Because Plaintiff had failed to demonstrate that the use of drop boxes permitted ballot harvesting or other fraud, there was no injury to Plaintiff's First or Fourteenth Amendment rights, and therefore "Plaintiff's claim falls under the *Anderson-Burdick* framework." *Id.* at *24.

For the same reasons, Plaintiffs' claims fail here. Plaintiffs cannot show that the rules or the guidance create a risk of ballot harvesting or any other form of election fraud, and therefore any rights that they might have under the First or Fourteenth Amendment have not been injured. Plaintiffs' claim for violation of any right to vote guaranteed by the First Amendment therefore fails, and Plaintiffs' TRO motion should be denied and their claims dismissed.

3. *Plaintiffs' equal protection claim fails because they cannot show arbitrary and disparate treatment among different classes of voters.*

In the voting rights context, equal protection means that "[h]aving once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104 (2000) (citation omitted). As with their First Amendment claims, the *Anderson-Burdick* framework balances any burden on the voter with the state's interest in voting regulation. Plaintiffs have shown no burden on their right to vote and no arbitrary or disparate treatment resulting from the rules or guidance. Plaintiffs have offered no facts or evidence showing that either the rules or the guidance values one person's vote (or one party's vote) over another or treats voters arbitrarily or disparately.

The Supreme Court's decision in *Bush v. Gore* stands in contrast to Plaintiffs' case, as that case found a violation of equal protection where certain counties were utilizing varying standards for what constituted a legal vote in the 2000 Florida recount. 531 U.S. at 105 ("The question before us … is whether the recount procedures … are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate"). Here, the Drop Box Rule, the Processing

Rule, and the May 2020 OEB guidance provide uniform and consistent standards *in complete harmony with the statutory framework* for each county to employ when verifying signatures on absentee ballot envelopes, in order to avoid the kind of ad hoc standards among counties that was found unconstitutional in *Bush*. They are the exact opposite of arbitrary and disparate treatment. As the *Wood* court found in rejecting a similar equal protection challenge, the signature match framework was applied in a "wholly uniform manner across the entire state.  In other words, no voter … was treated any differently than any other voter."  2020 U.S. Dist. LEXIS 218058 at *26.

       4.  *Plaintiffs' State Law Claims Are Barred by Sovereign Immunity*.

       Count V of Plaintiffs' Complaint raises a state law claim for violation of the Georgia Constitution and statutes. As set forth above, neither the Rules nor the guidance violate any provision of the Georgia Constitution or Georgia law. However, Count V of Plaintiffs' Complaint must be dismissed for lack of subject matter jurisdiction, as there has been no waiver of sovereign immunity to authorize a state law claim against the State Defendants.  The "sweep of sovereign immunity" under the Georgia Constitution is "broad." *Olvera v. Univ. Sys. of Ga.'s Bd. of Regents*, 298 Ga. 425, 426 (2016). The Georgia Supreme Court has held that sovereign immunity applies to public officials sued in their official capacities because these "are in reality suits against the state." *See Ga. Dep't of Natural Resources v. Ctr. for a Sustainable Coast*, 294 Ga. 593, 599 n. 4 (2014) (citing *Cameron v. Lang*, 274 Ga. 122, 126 (2001)).

       Accordingly, suits against public officials in their official capacities may only be permitted where there is an explicit waiver of sovereign immunity by the legislature.  Ga. Const. Art. I, Sec. II, Par. IX(e). "Where the sovereign has sovereign immunity from a cause of action, and has not waived that immunity, the immunity rises to a constitutional right and cannot be abrogated by any court." *Ga. Dep't of Cmty. Health v. Neal*, 334 Ga. App. 851, 854 (2015); s*ee*

*also Sustainable Coast*, 294 Ga. at 597 ("The history of sovereign immunity in our State shows that the 1991 amendment intended to expressly reserve the power to waive sovereign immunity exclusively to the legislature.").

Georgia courts have also made clear that it is the plaintiff's burden to demonstrate the existence of an explicit waiver of sovereign immunity to authorize the suit. *See, e.g.*, *Neal*, 334 Ga. App. at 855 ("It is axiomatic that the party seeking to benefit from the waiver of sovereign immunity bears the burden of proving such waiver."). Plaintiffs cannot make such a showing here because neither the Election Code nor any other provision of Georgia law contains a waiver of sovereign immunity against the State Defendants. Because Plaintiffs' state law claims are barred by sovereign immunity, they cannot demonstrate a likelihood of success on the merits of Count V of their Complaint. Plaintiffs' TRO motion must be denied, and this Count of Plaintiffs' Complaint should be dismissed for lack of jurisdiction.

**B. Plaintiffs will suffer no irreparable harm if the Court denies their motion.**

Plaintiffs' claim of irreparable harm is nonsensical: if the Court denies their request to rewrite the rules for handling absentee ballots in the January 5 Runoff, third party actors might engage in illegal ballot harvesting, or local elections officials might not properly verify signatures on absentee ballot envelopes. These are not sufficient claims of injury to warrant changing rules in the middle of an ongoing election. To the extent that a losing candidate—rather than dissatisfied supporters—seeks post-certification remedies, both a recount and election contest are available under Georgia law. *See* O.C.G.A. §§ 21-2-495; 21-2-522.

### C. The Balance of Equities Weighs Heavily against Injunctive Relief.

Courts in this district have considered the remaining two factors, balancing the equities and public interest, together in election cases. *See Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018). Both of these factors clearly weigh in favor of the State Defendants.

The State Defendants have a "strong interest in their ability to enforce state election law requirements." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011). For this reason, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm*., 140 S.Ct. 1205, 1207 (April 6, 2020) (per curiam) (citing *Purcell v. Gonzalez*, 549 U. S. 1 (2006)).

The Supreme Court and Eleventh Circuit have repeatedly stayed lower court injunctions that altered election rules once the 2020 general election cycle commenced. *See, e.g.*, *Andino v. Middleton*, No. 20A55, 592 U.S. __, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the *Purcell*] principle and this Court's precedents." (citations omitted)); *Merrill v. People First of Ala.*, 2020 U.S. LEXIS 3541, *1 (July 2, 2020); *New Ga. Project v. Raffensperger*, No. 20-13360, 2020 U.S. App. LEXIS 31405, at *11-12 (11th Cir. Oct. 2, 2020) ("[W]e are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute.").

Here, an election *is already in process*, and Plaintiffs seeks relief that, if fully granted, would result in the disruption of ongoing electoral processes, with the potential for voter confusion and wide-spread disenfranchisement. Any theoretical fear of injury that Plaintiffs might have pales

in comparison to the potential chaos and disruption that would result from the grant of the requested relief and the potential harm to voters ranging from confusion to disenfranchisement.

IV.     **Laches bars Plaintiffs' claims for equitable relief**

Laches bars a request for equitable relief when (1) the plaintiff delays in asserting the claim; (2) the delay is not excusable; and (3) the delay causes the non-moving party undue prejudice. *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). In the context of elections, "any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (*citing Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968)). As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made. *Id.*

Plaintiffs offer no reasonable excuse or evidence explaining their failure to bring their challenges to the Rules and the guidance prior to the commencement of the Runoff, before election officials began receiving absentee ballots in drop boxes, validating signatures on absentee ballot envelopes, and conducting early processing in advance of election day. And there is no question in this context that delay has substantially prejudiced the State Defendants, as well as the members of the public who have already cast legal ballots under these rules.

For these reasons, in *Wood v. Raffensperger*, the United States District Court for the Northern District of Georgia found that the plaintiff's claims involving the SEB rule on signature verification and the May 2020 OEB were barred by the doctrine of laches. 2020 U.S.Dist. LEXIS 218058 at *20-24 (N.D.Ga. Nov. 20, 2020). Like Wood, Plaintiffs have offered no explanation why they did not challenge the May 2020 OEB or the Rules, which have all been "in effect for at least three elections." *Id.* at *21. And as in *Wood*, Plaintiffs' requested relief "could disenfranchise a substantial portion of the electorate and erode the public's confidence in the

24

electoral process." *Id.* at *23. Therefore, this Court should find Plaintiffs' claims are barred by the doctrine of laches.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' emergency motion for injunctive relief must be denied and their Complaint must be dismissed.

Respectfully submitted, this 15th day of December, 2020.

CHRISTOPHER M. CARR   112505
Attorney General

BRYAN K. WEBB                743580
Deputy Attorney General

*/s/ Russell D. Willard*
Russell D. Willard              760280
Senior Assistant Attorney General


40 Capitol Square SW
Atlanta, GA 30334
rwillard@law.ga.gov
404-656-3300 (tel)

*Attorneys for State Defendants*

**CERTIFICATE OF SERVICE**

This is to certify that I have this day electronically filed the foregoing **CONSOLIDATED BRIEF IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS AND IN RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel for all parties of record via electronic notification.

Dated: December 15, 2020.

/s/ *Russell D. Willard*
Russell D. Willard
Senior Assistant Attorney General