**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | |
|---|---|
| THE TWELFTH CONGRESSIONAL DISTRICT REPUBLICAN COMMITTEE; BRIAN W. TUCKER an individual voter and resident of Richmond County; CATHY A. LATHAM, a 2020 candidate for Presidential Elector; and EDWARD T. METZ, a 2020 candidate for Presidential Elector, | Civil Action No. 1:20-cv-00180-JRH-BKE |

Plaintiffs,

v.

BRADFORD J. RAFFENSPERGER, in his official capacity as SECRETARY OF STATE OF GEORGIA; REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LEE, in their official capacities as Members of the Georgia State Election Board; and TIM MCFALLS, MARCIA BROWN, SHERRY T. BARNES, TERENCE DICKS, and BOB FINNEGAN, in their official capacities as Members of the RICHMOND COUNTY BOARD OF ELECTIONS,

Defendants,

and

DEMOCRATIC PARTY OF GEORGIA and DSCC,

Intervenor-Defendants.

**INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

Just weeks before Georgia's high-profile January 5, 2021 runoff election for its two U.S. Senate seats, Plaintiffs ask this Court to upend the state's absentee voting regime by eliminating sensible rules that have been in place for the last three elections, including the recent November 3, 2020 election. In several recent decisions, multiple federal judges have rejected similar efforts to challenge their constitutionality. *See generally Wood v. Raffensperger*, No. 1:20-cv-04651-SDG,

2020 WL 6817513 (N.D. Ga. Nov. 20, 2020) ("*Wood I*"), *aff'd*, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020) ("*Wood II*"); Tr. of Motions Hearing, *Pearson v. Kemp*, No. 1:20-CV-4809-TCB (N.D. Ga. Dec. 7, 2020) ("*Pearson* Tr.") (attached as Ex. 1).

Plaintiffs' request for preliminary relief is similarly unsupported by both the law and the facts. Though made under the auspices of election integrity, Plaintiffs fail to proffer *any* evidence of fraud. This omission is particularly glaring given that Georgia just completed a highly scrutinized and high-turnout presidential election, in which all of the challenged provisions were in place and the election results were confirmed by three separate counts of the ballots. If evidence was to be had to support Plaintiffs' claims, they had ample opportunity to procure it. Yet their meritless effort to displace Georgia's well-considered elections laws is as unsupported as its predecessors. And like those failed challenges, Plaintiffs' suit is sorely and fatally deficient.

But the Court need not even consider the merits of the challenge, because Plaintiffs have failed to establish that it has jurisdiction to do so. Plaintiffs lack standing and the Eleventh Amendment bars their claims because, even liberally construed, Plaintiffs' alleged harm amounts to nothing more than a generalized grievance that state officials failed to comply with state law. Finally, even if Plaintiffs could overcome these significant hurdles, the U.S. Supreme Court has repeatedly admonished federal courts to avoid disruptively altering voting rules on the eve of elections. This admonition is particularly salient here where not only has absentee voting already begun, but the runoff election will be conducted under the same rules as the November election, which Plaintiffs now seek to change at the eleventh hour.

## II.    BACKGROUND

In the leadup to Georgia's 2020 elections, Bradford J. Raffensperger, the Secretary of State (the "Secretary"), and the other members of the State Election Board (the "SEB") adopted and

promulgated various rules and guidelines related to absentee ballots.[1] At issue in this litigation are the following three specific pieces of rules or guidance: (1) Rule 183-1-14-0.8-.14 (the "Drop Box Rule"), which was first adopted by the SEB at its February 28, 2020 meeting and then readopted with minor variations at the SEB's July 1 and November 23 meetings; (2) an Official Election Bulletin issued by the Secretary on May 1, 2020 (the "Signature Matching Bulletin"); and (3) Rule 183-1-14-0.9-.15 (the "Ballot Processing Rule"), first adopted by the SEB at its July 1 meeting and readopted on November 23. Each constituted a straightforward exercise of discretionary authority and, until the sudden raft of post-election litigation brought by Republican candidates and their affiliates, was uncontroversial.

The Drop Box Rule allows county election officials "to establish one or more drop box locations as a means for absentee by mail electors to deliver their ballots to the county registrars." Compl. for Injunctive & Declaratory Relief ("Compl."), ECF No. 1, Ex. A, at 1. The Signature Matching Bulletin provides statewide guidance on the procedures for absentee ballot envelopes, designed to increase uniformity in signature matching determinations. *See id.* Ex. C. And the Ballot Processing Rule simply permits county officials to open and process absentee ballots prior to Election Day, enabling the faster tabulation of ballots on Election Day. *See id.* Ex. B.

The Signature Matching Bulletin and Drop Box Rule were therefore in place for Georgia's June 9 primary and August 11 primary runoff elections, as well as the November 3 general and special U.S. Senate elections. All three of the provisions, including the Ballot Processing Rule, were in place for the November elections.

---

[1] The Rules at issue can be found on the Secretary's website. *See Rules and Rulemaking of the State Election Board*, Ga. Sec'y of State, https://sos.ga.gov/index.php/elections/state_election_board (follow "Rules and Rulemaking of the State Election Board" hyperlink) (last visited Dec. 15, 2020).

On November 3, Georgia held its election and special U.S. Senate elections, with both of the state's U.S. Senate seats on the ballot. Georgia law requires a winning candidate to receive "a majority of the votes cast." O.C.G.A. § 21-2-501(a)(1). If no candidate surpasses the 50 percent threshold, the state holds a runoff election between the two candidates that received the highest vote totals. *Id.* Because no candidate for either U.S. Senate seat won a majority of the vote in November, Georgia will hold a runoff election on January 5, 2021. *See* Compl. ¶ 12.

Plaintiffs filed this action on December 9, five days before early voting commenced and less than one month before the runoff election. As of yesterday, roughly 1.2 million voters had requested absentee ballots, with more than 200,000 already returned. *See* Alexa Corse, *Georgia Senate Runoffs Early Voting Begins as Requests for Mail-in Ballots Top 1 Million*, Wall St. J (Dec. 14, 2020), https://www.wsj.com/articles/georgia-senate-runoffs-early-voting-begins-as-requests-for-mail-in-ballots-top-1-million-11607953020. In the midst of this election, already well underway, Plaintiffs seek to change the rules. They challenge the Drop Box Rule, Ballot Processing Rule, and Signature Matching Bulletin, asserting that these provisions violate the U.S. Constitution's Elections and Electors Clauses (Counts I and II), *id.* ¶¶ 62–69; Plaintiffs' right to vote and associate based on a theory of vote dilution (Count III), *id.* ¶¶ 70–81; the Equal Protection Clause (Count IV), *id.* ¶¶ 82–84; and Georgia law (Count V), *id.* ¶¶ 85–91.

Plaintiffs filed their emergency motion for injunctive relief the same day that they filed their complaint. *See* Pls.' Emergency Mot. for TRO & Prelim. Inj. ("Mot."), ECF No. 2. Their bare-bones motion appears to seek relief only on their claims under Georgia law and the First and Fourteenth Amendments. *See, e.g.*, Mem. in Supp. of Pls.' Mot. for Prelim. Inj. ("Mem."), ECF No. 2, at 3–4. The only evidence they offer in support of their motion is a single declaration by a Richmond County voter, and a late-filed declaration similarly complaining about purported county

administration issues. *See* Mot. Ex. A; ECF No. 25. With these paltry submissions, Plaintiffs ask this Court for extraordinary, last-minute relief that would prohibit Defendants from administering the election in accordance with previously established rules and guidance.

### III.   ARGUMENT

#### A.   Plaintiffs lack standing.

This Court need not reach the merits of Plaintiffs' claims because they lack standing to bring them. To demonstrate Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). As noted above, Plaintiffs raise only First Amendment, Fourteenth Amendment, and state law claims in their motion. They have failed to establish that they have standing to pursue these claims—or any of the other claims pleaded in their complaint. As a result, this Court lacks jurisdiction over this action in its entirety and has no power to enter the relief that Plaintiffs seek.

#### 1.   Plaintiffs have suffered no injury sufficient to raise a First Amendment claim.

Plaintiffs seek, under the trappings of the First Amendment, to raise a claim that Defendants' practices unduly burden Plaintiffs' right to vote by "enabl[ing] numerous absentee voters to vote illegally" and thereby "discount[ing] and cancel[ling] the votes of the Individual Plaintiffs." Compl. ¶ 72. But as many federal courts have repeatedly and definitively held, these types of allegations are inadequate to allege an injury sufficient for standing.

The purported injury of vote-dilution-through-unlawful-balloting has been repeatedly rejected as a viable basis for standing, and for good reason: supposed vote dilution caused by counting supposedly improper votes would affect *all* Georgia voters, not just Plaintiffs, making it no more than a generalized grievance. *See, e.g.*, *Wood II*, 2020 WL 7094866, at *5 (holding theory of vote dilution does not provide personal, distinct injury necessary for standing because "'no

single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote'" (quoting *Bognet v. Sec'y of Commonwealth*, 980 F.3d 336, 356 (3d Cir. 2020))); *Bognet*, 980 F.3d at 354–56 ("Th[e] conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment."); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) (finding vote-dilution theory too speculative to confer standing); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) (concluding vote-dilution theory amounted to generalized grievance that could not confer standing); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020) (similar). Plaintiffs' claims here are not meaningfully different from those rejected for lack of standing in these cases.

Plaintiffs try to salvage standing by asserting that they are injured because the "12th District Committee" must divert additional resources from activities it would undertake to instead engage in "efforts to counter or minimize the consequences of the ballot harvesting that" Defendants' conduct purportedly permits. Compl. ¶ 75; *see also* Mem. 8. But this assertion, like the vote-dilution-by-fraudulent-ballot theory that courts have soundly rejected, rests on speculation and conjecture that voters will in fact cast unlawful ballots. Thus, for the same reason, it is not "concrete" or "imminent" enough to support standing. *See, e.g.*, *Cegavske*, 2020 WL 5626974, at *4; *Paher*, 457 F. Supp. 3d at 926–27. Moreover, courts have recognized that merely spending money to combat a speculative injury cannot alchemize the expenditure into a cognizable injury for Article III purposes, since a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly

impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Plaintiffs have thus failed to establish that they have standing to pursue this claim, whether as individuals or as entities.

### 2.      Plaintiffs have not suffered an injury under the Equal Protection Clause.

Plaintiffs' contention that disparate treatment of in-person and absentee voters provides an injury to support their claim under the Equal Protection Clause, *see* Compl. ¶ 82, is equally unavailing. The caselaw firmly establishes that this type of allegedly differential treatment is not by itself a cognizable harm. Importantly, Plaintiffs have *not* alleged that they were prevented from voting or had their votes denied based on signature matching or anything else. Nor do Plaintiffs allege that any voters were treated differently because of a suspect classification or that disparate treatment caused a deprivation of a fundamental right. Instead, they merely claim an injury because "the state is *not* imposing a restriction on *someone else's* right to vote." *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992, at *12 (M.D. Pa. Nov. 21, 2020) (quoting *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *44 (W.D. Pa. Oct. 10, 2020)), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Commonwealth*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020). As these cases and others establish, the mere fact of some differential treatment of voters within a state does not alone constitute an injury absent some harm to Plaintiffs resulting from that treatment. *See, e.g.*, *ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) ("Absentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures.") (citations omitted); *id.* at 1320-21 (B]ecause there are clear differences between the two types of voting procedures, the law's distinction is proper."); *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 830-31 (S.D. Ind. 2006) (It is an "obvious fact that absentee voting is an inherently different procedure from in-person voting.").

**3.      Plaintiffs have suffered no injury due to purported violations of Georgia law.**

Plaintiffs do not allege any injury from Defendants' purported violations of Georgia law outside of the basic fact that the law was not followed. But a simple complaint that Defendants are not following the law—absent more—is "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that does not confer standing. *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332–33 (11th Cir. 2007) (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992) ("[R]aising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); *Wood II*, 2020 WL 7094866, at *4 (holding that injury to right "that government be administered according to the law" is generalized grievance). Even if Plaintiffs were correct in their allegations regarding Georgia law—they are not, *see infra* Section III.C.1.c—they would still lack standing because they can point to no individualized injury.

**4.      Plaintiffs have not raised the Electors and Elections Clauses in their motion, but lack standing to bring claims under these provisions.**

While Plaintiffs assert claims under the Elections and Electors Clauses in their complaint, their motion has no assertions about their likelihood of success on these counts. In any event, Plaintiffs, as private individuals and a private organization, lack standing to raise claims under the Elections or Electors Clause. Plaintiffs again provide no allegations demonstrating how they are particularly harmed by the alleged violations. Instead, their recurring grievance is that Defendants did not follow the law regarding absentee ballot procedures. *See, e.g.*, Compl. ¶¶ 34–61; Mot. ¶¶ 1–

2. This is "precisely the kind of undifferentiated, generalized grievance about the conduct of government" insufficient to satisfy standing requirements. *Lance*, 549 U.S. at 442.

Nor do the presidential electors' assertions that they are candidates save them. First, and most obviously, the presidential election is over. This litigation concerns the upcoming runoff election for U.S. Senate, and so the fact that the individual Plaintiffs "were and will in the future be candidates to serve as Presidential electors," Mem. 8, is simply irrelevant to their request for injunctive relief regarding a Senate runoff. But even ignoring that salient detail, federal courts—including in the Northern District of Georgia just one week ago, in a case considering this very question as applied to the Signature Matching Bulletin, *see Pearson* Tr. 42—have repeatedly held that even individuals *who are candidates in the election in which they seek judicial intervention* lack Article III standing to challenged alleged violations of state law under the Elections Clause. *See, e.g.*, *Bognet*, 980 F.3d at 348–52 (finding voters and candidate lacked standing to bring claims under Elections and Electors Clauses); *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261, at *3–5 (D. Ariz. Dec. 9, 2020) (presidential electors lacked standing to bring claims under Elections and Electors Clauses); *Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668, at *2 (S.D. Tex. Nov. 2, 2020) (holding candidate lacked standing under Elections Clause and concluding that U.S. Supreme Court's cases "stand for the proposition that only the state legislature (or a majority of the members thereof) have standing to assert a violation of the Elections Clause"). This conclusion is a natural consequence of the fact that the Elections and Electors Clauses empower state legislatures, and so any purported violation of them belongs to the

legislature alone. *See, e.g.*, *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (per curiam) (noting that the Elections Clause "affirmatively grants rights to state legislatures").[2]

For the same reason, Plaintiffs also lack prudential standing to bring claims under the Elections and Electors Clauses. "Even if an injury in fact is demonstrated, [] a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Plaintiff's Elections and Electors Clauses claims, by contrast, "rest . . . on the legal rights or interests of third parties," *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)—namely, the rights of the Georgia General Assembly. Plaintiffs cannot assert the General Assembly's rights, since they neither possess a close relationship with the General Assembly nor identify a "hindrance to the [General Assembly's] ability to protect [its] own interests." *Kowalski*, 543 U.S. at 130; *see also Bognet*, 980 F.3d at 350–51.

## B.    The Eleventh Amendment bars this Court from exercising jurisdiction.

Even if Plaintiffs had standing, the Eleventh Amendment bars this Court's exercise of judicial power to issue Plaintiffs' requested relief. A federal court cannot order state officials to conform their conduct to state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Plaintiffs are explicit that they seek an order from this Court requiring "that Defendants comply with Georgia law." Mot. ¶ 4. While they attempt to couch their complaint in the language of federal constitutional claims, Plaintiffs ultimately ask the Court to compel election authorities to do what they believe *Georgia* law requires. The Court cannot entertain such a request for injunctive relief requiring state officials to comply with state law.

---

[2] Although separate provisions, the Electors and Elections Clauses share "considerable similarity" and should be interpreted in the same manner. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting); *see also Foster v. Love*, 522 U.S. 67, 69 (1997) (referring to Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *Bognet*, 980 F.3d at 349 (applying same test for standing under both clauses).

As the U.S. Supreme Court explained decades ago in *Pennhurst*, "the principles of federalism that underlie the Eleventh Amendment" prohibit a federal court from granting "relief against state officials on the basis of state law, whether prospective or retroactive." 465 U.S. at 106; *see also id.* at 117 ("[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when . . . the relief sought and ordered has an impact directly on the state itself."). This is true even where, as here, state law claims are thinly cloaked in federal causes of action. *See, e.g.*, *Balsam v. Sec'y of State*, 607 F. App'x 177, 183–84 (3d Cir. 2015) (holding Eleventh Amendment bars state law claims even when "premised on violations of the federal Constitution"); *Massey v. Coon*, No. 87-3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (affirming dismissal of suit where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *Six v. Newsom*, 462 F. Supp. 3d 1060, 1073 (C.D. Cal. 2020) (denying temporary restraining order in part because Fifth and Fourteenth Amendment claims were predicated on violations of state law); *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 626 (E.D. Pa. 2018) ("Even when voters attempt to 'tie their state law claims into their federal claims,' the Eleventh Amendment bars the state law claims." (quoting *Balsam*, 607 F. App'x at 183)); *Thompson v. Alabama*, No. 2:16-CV-783-WKW, 2017 WL 3223915, at *8 (M.D. Ala. July 28, 2017) (denying injunction where plaintiffs' federal constitutional claims rested on premise that state officials were violating state law).

Here, Plaintiffs' causes of action are nothing more than state law concerns masquerading as federal claims. They repeatedly note that their true concern is their (mistaken) belief that Defendants' actions conflict with the Georgia Election Code. *See* Mot. ¶¶ 1–2 (claiming that Defendants' actions violate Georgia law); *id.* ¶ 4 ("Plaintiffs seek nothing more than that

Defendants comply with Georgia law."); *id.* ¶ 8 ("Plaintiffs are seeking an order prohibiting [actions] in violation of the Georgia Election Code."); Mem. at 2 ("Defendants have violated Individual Plaintiffs' rights to freedom [of] association and equal protection as a result of their rules and procedures adopted in direct conflict with [state law]."); *id.* at 6 (noting that Defendants "have imposed new and unauthorized procedures and requirements that are in direct conflict with Georgia statutes"); *id.* at 9 (noting that Plaintiffs' requested relief is "preliminary and permanent injunctions prohibiting Defendants' violations of Georgia election statutes"). This is not how the Constitution works. *See, e.g.*, *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not . . . 'transgress against the Constitution.'" (quoting *Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir. 1987))); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations . . ."). At bottom, Plaintiffs' claims concern state court violations—no more, no less.[3]

While the Secretary and SEB are, as state officials, indisputably shielded by the Eleventh Amendment, in this case the members of the Richmond County Board of Elections are as well. Although counties are not ordinarily considered arms of the state for Eleventh Amendment purposes, the remedies Plaintiffs seek can *only* be enforced by state officials because they seek the invalidation of state laws. *See* Compl. ¶ 13 (making clear that Plaintiffs seek prospective relief to invalidate Drop Box Rule, Ballot Processing Rule, and Signature Matching Bulletin); *see also*

---

[3] Notably, federal courts regularly reject state law claims against state officials in litigation involving election administration. *See, e.g.*, *Ohio Republican Party v. Brunner*, 543 F.3d 357, 360–61 (6th Cir. 2008) (*Pennhurst* bars claim that Secretary of State violated state election law); *Acosta*, 288 F. Supp. 3d at 628 (Eleventh Amendment bars Pennsylvania Election Code claims); *Veasey v. Perry*, 29 F. Supp. 3d 896, 922 (S.D. Tex. 2014) (Eleventh Amendment bars claim that state officials violated state constitution); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1358–59 (N.D. Ga. 2005) (same).

*Porter v. Gore*, 354 F. Supp. 3d 1162, 1180 (S.D. Cal. 2018) (finding *Pennhurst* extends to claims against local officials where effect would be to invalidate state law). The Eleventh Amendment bar thus extends to each Defendant in this case.

**C.     Plaintiffs are not entitled to a temporary restraining order or preliminary injunction.**

The Court should further deny Plaintiffs' motion because they have failed to show they are entitled to injunctive relief. "A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should not be granted unless the movant clearly carries the burden of persuasion," *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974). To carry that burden, the moving party must show:

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) a showing that he will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to him outweighs the harm the injunction may cause the opposing party; and (4) a showing that granting the injunction would not be adverse to the public interest.

*Duke v. Cleland*, 954 F.2d 1526, 1529 (11th Cir. 1992); *see also Wood I*, 2020 WL 6817513, at *4 (noting that standards for TRO and preliminary injunction "are identical"). Plaintiffs fail to carry their burden on *any* of the factors for injunctive relief, and so their motion must be denied.

**1.     Plaintiffs have not shown a likelihood of success on the merits.**

Despite their bullish claim that "the actions of Defendants at issue violate the unambiguous language of several Georgia election statutes," Mem. 5–6, Plaintiffs have neither pleaded and proved viable constitutional claims nor demonstrated any impermissible departure from the state's election laws. Accordingly, they cannot succeed on the merits of their claims.

**a.     Plaintiffs' vote-dilution claims are not a First Amendment violation.**

Plaintiffs are unlikely to succeed on their ostensible First Amendment claim, *see* Mem. 5–7, an unwieldy amalgamation that, "like Frankenstein's Monster, has been haphazardly stitched together from [] distinct theories in an attempt to avoid controlling precedent." *Boockvar*, 2020

WL 6821992, at *4. Although seemingly suggesting a burden on the right to vote, Plaintiffs do not actually allege that they or their members were unable to vote, were otherwise burdened in their casting of ballots, or were unable to associate politically. Instead, their First Amendment claim ultimately concerns another grievance: that their "right to have their votes counted in a reliable manner without discount or cancellation" has been abridged. Compl. ¶ 71; *see also, e.g.*, *id.* ¶ 72 (alleging that "Defendants' adoption of procedures that conflict with Georgia statutes designed to assure that every absentee voter is qualified to vote and that enable numerous absentee voters to vote illegally effectively discounts and cancels the votes of the individual Plaintiffs"); *id.* ¶ 76 ("Defendants' new rules and procedures increase the likelihood that illicit absentee ballots will be included in the final and total count in future elections . . . .").

Vote dilution, however, is a viable basis for federal claims only in certain contexts, such as when laws structurally devalue one community's votes over another's. *See, e.g.*, *Bognet*, 980 F.3d at 355 ("[V]ote dilution under the Equal Protection Clause is concerned with votes being weighed differently."); *Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("[A]n individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."). Courts have repeatedly rejected Plaintiffs' "conceptualization of vote dilution—state actors counting ballots in violation of state election law"—as failing to state a concrete or cognizable harm under the U.S. Constitution. *Bognet*, 980 F.3d at 354; *accord Wood I*, 2020 WL 6817513, at *8–10 (considering Georgia's signature matching procedures and concluding that vote-dilution injury is not "cognizable in the equal protection framework").

Plaintiffs cannot identify a single apposite precedent adopting their theory under *any* constitutional provision, let alone the First Amendment. And there is no authority for

transmogrifying the vote-dilution line of cases into a requirement that federal judges manage election procedures and, in their zeal to enforce state election law, disenfranchise lawful voters based on a plaintiff's (speculative) claims of unlawful balloting. C*f. Short v. Brown*, 893 F.3d 671, 677–78 (9th Cir. 2018) ("Nor have the appellants cited any authority explaining how a law that makes it easier to vote would violate the Constitution.").[4] Instead, courts have routinely rejected such efforts. *See Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031–32 (8th Cir. 2013); *Boockvar*, 2020 WL 5997680, at *67–68.

Ultimately, Plaintiffs have not alleged a cognizable vote-dilution claim. Nor have they submitted *any* evidence of voter fraud in Georgia tied to absentee balloting; to the contrary, the rules that they challenge have been in place for several elections and no indication of unlawful voting has emerged "despite a substantial increase in the total number of absentee ballots submitted by voters [in the 2020 General Election]." *Wood I*, 2020 WL 6817513, at *10 (rejecting vote-dilution claim where "it is not supported by the evidence"). Moreover, Plaintiffs have failed to adduce any evidence that their right to associate or vote was improperly curtailed by Defendants. Plaintiffs therefore cannot succeed on the merits of their First Amendment claim.

### b.   Plaintiffs' claim under the Equal Protection Clause fails.

Plaintiffs' equal protection claim, *see* Compl. ¶¶ 82–84, is similarly noncognizable.

*First*, Plaintiffs claim an injury stemming from "[t]he disparate treatment of the individual Plaintiffs who vote in person when compared to the treatment of absentee voters." *Id.* ¶ 82. But as another district court recently explained,

---

[4] Indeed, "if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots 'were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop the illegal activity.'" *Bognet*, 380 F.3d at 355 (quoting *Boockvar*, 2020 WL 5997680, at *46).

> [i]t is well-settled that states may employ in-person voting, absentee voting, and mail-in voting and each method need not be implemented in exactly the same way.
>
> "Absentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." It is an "obvious fact that absentee voting is an inherently different procedure from in-person voting." Because in-person voting is "inherently different" from mail-in and absentee voting, the procedures for each need not be the same.

*Boockvar*, 2020 WL 5997680, at *61 (citations omitted) (first quoting *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008); and then quoting *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 830–31 (S.D. Ind. 2006)). Because "the inherent differences and opportunities afforded to in-person voters compared to mail-in and absentee voters provides sufficient reason to treat such voters differently," *id.* at *63, disparate treatment between in-person and absentee voters does not lend itself to a viable equal protection claim. And to the extent Plaintiffs suggest that any deviation from state law is an equal protection violation, such claims cannot be "based solely on state officials' alleged violation of state law that does not cause unequal treatment. . . . That is not how the Equal Protection Clause works." *Bognet*, 980 F.3d at 355.

*Second*, Plaintiffs contend that "[t]he disparate treatment of the 12th District Committee and its designated monitors who were prevented from observing vote counting and signature verification when compared to the treatment of Democrats similarly appointed violates" equal protection. Compl. ¶ 83. But this theory fails for want of even a hint of evidentiary support; the only piece of evidence submitted by Plaintiffs in connection with their motion does not address this supposed disparity, *see* Mot. Ex. A, and their motion does not even raise the issue. Plaintiffs thus cannot succeed on the merits of their unsupported equal protection claim.

### c.      Plaintiffs' state law claim fails.

In their motion, Plaintiffs suggest that Defendants' actions violate Georgia law, but they do not support that claim with any reasoning or explanation. *See* Mot. ¶¶ 1–2; Mem. 6. For this

reason alone, their motion should be denied as to any state law claims. But even if Plaintiffs intended to incorporate the allegations in their complaint—and could permissibly do so, *cf. Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012) ("[P]leadings are only allegations, and allegations are not evidence of the truth of what is alleged.")—their motion would still fail. For the reasons discussed in Section III.B *supra*, any claims seeking to require Defendants to conform to Georgia law are precluded by the Eleventh Amendment. And even if Plaintiffs could survive this bar, they would still not be able to show a likelihood of success on the merits because their state law claim is based on a fundamentally flawed interpretation of Georgia's Election Code.

*First*, Plaintiffs wrongly argue that the Drop Box Rule violates Georgia law. *See* Mem. 3. As support, they point to O.C.G.A. § 21-2-382, which allows county boards of registrars to "establish additional sites as additional registrar's offices . . . for the purpose of voting absentee ballots" so long as "any such site is a branch of the county courthouse, a courthouse annex, a government service center providing general government services, another government building generally accessible to the public, or a location that is used as an election day polling place, notwithstanding that such location is not a government building." O.C.G.A. § 21-2-382(a); *see also* Compl. ¶ 45. Plaintiffs argue that the statute does not expressly contemplate drop boxes—and thus prohibits them—but they misconstrue the statute. Section 21-2-382 allows counties to establish additional "sites"; in other words, "a piece of property set aside for a specific use," *Site*, *Black's Law Dictionary* (11th ed. 2019), or "a space of ground occupied or to be occupied by a building," *Site*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003). Under the Drop Box Rule, counties may only establish drop boxes on "county or municipal government property generally accessible to the public." Compl. Ex. A, at 1. That is *exactly* the sort of location allowed

by Section 21-2-382.[5] The Drop Box Rule thus does not conflict with—and is instead a reasonable construction of—Georgia law, and the SEB was empowered to promulgate it.[6]

Plaintiffs do not explain why their concerns about ballot harvesting—which are misplaced and unsubstantiated in any event—undercut the validity of the Drop Box Rule. *Cf.* Compl. ¶ 11 (claiming that Drop Box Rule "allow[s] absentee ballots to be delivered to unattended drop boxes" by unauthorized individuals "with no mechanism to ensure their legitimacy"). The Election Code already specifies who can deliver or mail a voter's absentee ballot, and the Drop Box Rule requires all drop boxes to "clearly display signage . . . regarding Georgia law related to absentee ballot harvesting." *Id.* Ex. A, at 2. Furthermore, while Plaintiffs characterize drop boxes as "unattended," the Drop Box Rule requires all drop boxes to "have adequate lighting and use a video recording device to monitor each drop box location." *Id.* Ex A, at 1. Plaintiffs' baseless speculation that drop boxes might lead to an increased *possibility* of voter fraud does not mean that any fraud will occur, much less that the use of drop boxes violates Georgia law. *See Boockvar*, 2020 WL 5997680, at *33 (rejecting plaintiffs' arguments that drop boxes might lead to future fraud because "there's no way of knowing whether these independent actors [who allegedly want to and will commit fraud] will ever surface"). Indeed, Plaintiffs fail to demonstrate why the supposed injuries incurred from drop boxes would be any different than what occurs when voters use the mail to return their ballots—a practice that even Plaintiffs must indisputably recognize is valid under Georgia law.

---

[5] Plaintiffs argue that drop boxes must be located in "a building with staff capable of receiving absentee ballots and verifying the signature," Compl. ¶ 46, but they ignore the plain language of Section 21-2-382(a) and its reference to "sites." They also claim that voters must deliver absentee ballots "in person," *id*. ¶ 49, but the statute simply requires an absentee voter to "personally mail or personally deliver" an absentee ballot. O.C.G.A. § 21-2-385(a). There is no requirement of "in person" delivery to a member of the board of registrars or an absentee ballot clerk, Compl. ¶ 47—nor could there be, since voters are allowed to vote by mail.
[6] Plaintiffs, incidentally, do not challenge the location of any specific drop box or argue that any specific drop box violates Georgia law.

*Second*, Plaintiffs are also wrong to suggest that the Signature Matching Bulletin exceeds Defendants' authority, *see* Compl. ¶ 9, as this argument was considered and rejected by Judge Grimberg of the Northern District of Georgia in a recent opinion. *See generally Wood I*, 2020 WL 6817513. As detailed by Judge Grimberg, the Secretary issued an earlier version of the Signature Matching Bulletin in March 2020 as part of a settlement agreement with Intervenor-Defendants. After the November election, a plaintiff sued the Secretary, claiming that the settlement agreement (and the language that Plaintiffs now challenge here) exceeded the Secretary's authority. *See id.* at *10. Judge Grimberg rejected that argument, holding that the settlement agreement was a valid "manifestation of Secretary Raffensperger's statutorily granted authority" and "does not override or rewrite state law." *Id.* (holding settlement agreement was lawful although not "a verbatim recitation of the statutory code"). Judge Grimberg's analysis applies squarely to this case.

In any event, Plaintiffs misconstrue the statute on which they rely. Section 21-2-386(a)(1)(B) requires the registrar or clerk to "compare the signature" on an absentee ballot envelope with the signatures "on the absentee elector's voter registration card . . . and application for absentee ballot." If the signature "appear[s] to be valid," then the registrar or clerk "so certif[ies] by signing or initialing his or her name below the voter's oath." *Id.* Contrary to Plaintiffs' representations, the statute does *not* require the signature on the absentee ballot envelope to match the signature on both the voter registration card and the absentee ballot application.[7] Plaintiffs argue that the Signature Matching Bulletin "eliminates" a statutory requirement "that the signature

---

[7] Plaintiffs allege, without specifics, that some "registrars and clerks failed to perform the required signature verification" in the general election. Compl. ¶ 56. It is unclear whether they mean registrars and clerks failed to check signatures *at all* or just failed to check signatures to Plaintiffs' liking. In either event, this bare-bones allegation is not enough to justify injunctive relief. Plaintiffs' late-filed affidavit—relaying a story the affiant claims they heard from a Richmond election official—is textbook hearsay and does not rescue this claim. *See* ECF No. 25 ¶¶ 15, 16.

on the absentee ballot envelope matches *both* the signature on the application for an absentee ballot *and* the signature on the absentee voter's voter registration card." Compl. ¶ 9 (emphases added); Mem. 3.[8] But Plaintiffs' draconian reading of Section 21-2-386(a)(1)(B) is far removed from the statutory text, which does not require the signatures on all three documents to match. Indeed, if Plaintiffs' construction were credited, then it would raise serious constitutional concerns that the statute could deprive voters of the fundamental right to vote, since it is a "basic fact that [an individual's] signature [can] vary" for "myriad [] potential reasons." *Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJD, 2020 WL 4882696, at *14 (S.D. Ind. Aug. 20, 2020); *see also Reynolds*, 377 U.S. at 555 n.29 ("The right to vote includes the right to have the ballot counted." (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting))).[9]

Finally, while Plaintiffs complain about the Ballot Processing Rule, they fail to acknowledge that the General Assembly has granted the Secretary and SEB significant authority to manage Georgia's election system, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b) (Secretary is Georgia's chief election official); *id.* § 21-2-31 (delegating authority to SEB to promulgate election rules); *Wood*, 2020 WL 6817513, at *2; *Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1345 (N.D. Ga. 2019) (SEB is "charged with enforcing Georgia's election code under state law"). Plaintiffs also fail to mention that, when a plaintiff challenges a regulation issued

---

[8] If Plaintiffs are claiming that the Signature Matching Bulletin does not "require[e] the verification of every absentee voter's signature," Mem. 6, they are mistaken. The very first sentence discusses signature matching: "Verifying that a voter's signature on his or her absentee ballot matches his or her signature on the absentee ballot application or in the voter registration record is required by Georgia law and is crucial to secure elections." Compl. Ex. C, at 1.

[9] Indeed, as an expert in *Frederick* testified, "determining whether a signature is genuine is difficult even for a trained expert, as signatures are written in different styles with varying levels of readability and variability. . . . [T]he rate of error among laypersons is generally attributable to an incorrect determination that 'variations' between one individual's signatures are instead 'differences' between multiple individuals' signatures." 2020 WL 4882696, at *14.

by an agency with rulemaking authority, state courts apply a highly deferential standard of review. *See Albany Surgical, P.C. v. Dep't of Cmty. Health*, 257 Ga. App. 636, 637 (2002). The Ballot Processing Rule was a reasonable, lawful exercise of the Secretary and SEB's delegated authority.

Plaintiffs, in short, have failed to identify any violation of Georgia law, let alone one that could be constitutionally remedied by this Court. Their motion should be denied.

### d.   Plaintiffs have not alleged viable Elections or Electors Clause claims.

Counts I and II of Plaintiffs' complaint allege that the Drop Box Rule, Ballot Processing Rule, and Signature Matching Bulletin are beyond the authority granted to Defendants by the Georgia General Assembly and thus in violation of the Elections and Electors Clauses of the U.S. Constitution. Although these claims are not included in their motion for preliminary injunctive relief, Plaintiffs cannot succeed on the merits even if they were properly raised.

The Elections Clause vests authority in "the Legislature" of each state to regulate presidential elections. U.S. Const. art. II, § 1, cl. 2. The U.S. Supreme Court has held, however, that state legislatures can delegate this authority—including to state officials like the Secretary and SEB. *See, e.g.*, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 807 (2015) (noting that Elections Clause does not preclude "the State's choice to include" state officials in lawmaking functions so long as such involvement is "in accordance with the method which the State has prescribed for legislative enactments" (quoting *Smiley v. Holm*, 285 U.S. 355, 367 (1932))); *Corman*, 287 F. Supp. 3d at 573 ("The Supreme Court interprets the words 'the Legislature thereof,' as used in that clause, to mean the lawmaking processes of a state." (quoting *Ariz. State Legislature*, 576 U.S. at 816)).

Here, the Secretary and the other Defendants acted consistently with the authority granted to them by under Georgia law. As Plaintiffs admit in their complaint, the SEB is empowered to "promulgate rules and regulations" governing the state's elections, O.C.G.A. § 21-2-31(1)–(2),

and as discussed above, the Secretary lawfully issued the Signature Matching Bulletin. Accordingly, the Drop Box Rule, the Ballot Processing Rule, and the Signature Matching Bulletin each constitute lawful exercises of Defendants' authority. And because Defendants acted pursuant to the dictates of Georgia's election laws, no violation of the Elections or Electors Clause occurred. *See Wood I*, 2020 WL 6817513, at *10–11.

### 2. Plaintiffs have failed to show irreparable harm.

"A showing of irreparable harm is 'the *sine qua non* of injunctive relief.'" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978)). "[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Such injury must be "actual and imminent," not "remote [or] speculative." *Id.* (quoting *Gen. Contractors*, 896 F.2d at 1285).

Plaintiffs' haphazard attempts to manufacture cognizable injuries repeatedly come up short. In their motion, Plaintiffs argue that because absentee ballots are "the largest source of *potential* voter fraud," Defendants' actions "will encourage and facilitate vote harvesting," thereby diluting the relative weight of Plaintiffs' votes compared to their Democratic Party counterparts. Mem. 8 (emphasis added). But the mere "potential" for fraud that may or may not "encourage" or "facilitate" improper behavior is far too slender a reed to support a finding of imminent, irreparable harm. Plaintiffs further fail to acknowledge that these very same standards of election administration were enforced and upheld *just one month* ago during the November election. *See generally, e.g.*, *Wood I*, 2020 WL 6817513 (upholding Georgia's signature matching regime); *Wood II*, 2020 WL 7094866 (affirming); *Pearson* Tr. (upholding Georgia's signature matching regime and absentee processing); *Boland v. Raffensperger*, No. 2020CV343018 (Ga. Super. Ct.

Dec. 8, 2020) (dismissing state court contest challenging Georgia's signature matching processes) (attached as Ex. 2). These plaintiffs were unable to identify any judicially cognizable form of irreparable injury, and for the same reasons Plaintiffs fail to do so here.

Moreover, by putting forth "quintessential generalized grievance[s]," Plaintiffs have also failed to present any evidence in their motion as to how they will suffer "any particularized harm as [] voter[s]" by the denial of their motion. *Wood I*, 2020 WL 6817513, at *12. Plaintiffs' vague references to "injury to their constitutional rights," Mem. 9, cannot, without any supporting evidence or even elaboration, satisfy the significant showing required by this factor.

### 3. Neither the balance of the equities nor the public interest favors injunctive relief.

In election cases, courts often consider the remaining two factors—the balance of equities and public interest—together. *See, e.g.*, *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018). These factors militate against Plaintiffs' requested relief for at least two reasons.

*First*, their case is untimely. Plaintiffs have waited until the eve of early voting in this high-profile election to bring their claims, the factual underpinnings of which have been known to Plaintiffs for several months now. At a minimum, this constitutes an unreasonable delay in filing, which greatly prejudices the administration of the election and is furthermore barred by the equitable doctrine of laches. *See, e.g.*, *Smith v. S.C. Election Comm'n*, 874 F. Supp. 2d 483, 498 (D.S.C. 2012) (considering laches under balance of equities prong of preliminary injunction standard); *Wood I*, 2020 WL 6817513 (finding laches barred similarly delayed claims); *Pearson* Tr. 43 (similar); *Boland*, slip op. at 3 (laches barred plaintiff's claims based "on procedures which were adopted long before the election and upon which elections officials and voters alike relied").[10]

---

[10] Such an inexcusable delay also weakens any claim to irreparable injury. *See, e.g.*, *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) ("A preliminary injunction is sought upon the theory

*Second*, Plaintiffs have failed to demonstrate how their preferred remedies will benefit the voters of Georgia. "[A]llowing for easier and more accessible voting for all segments of society serves the public interest." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1224 (N.D. Fla. 2018). Moreover, the public interest is best "served by ensuring that qualified absentee voters have the opportunity to vote and, more importantly, have their votes counted." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1347 (N.D. Ga. 2018). Plaintiffs' lawsuit is in direct opposition to these principles of greater access to the franchise. Based on nothing more than vague concerns of potential fraud and unsubstantiated allegations of injury, Plaintiffs seek to eliminate safe and accessible ballot return options for millions of Georgians and undo the state's tried and true election administration, objectives that would serve to hinder—not safeguard—the franchise. *See Paher*, 457 F. Supp. 3d at 935 ("[E]ven accepting Plaintiffs' purported harm to them of being disenfranchised due to vote dilution, such disenfranchisement could be, even more concretely, claimed in the absence of the Plan (and additionally by confusion that may result by the Court enjoining the Plan . . .)."). Their motion should therefore be denied.

**D.    The principles animating the U.S. Supreme Court's recent elections jurisprudence counsel against an injunction here.**

Relatedly, even if Plaintiffs had pleaded and proved legitimate constitutional claims (they have not), they filed a case asking a federal court to issue an injunction that would drastically alter state voting procedures *less than one week* before the state was set to begin using those procedures. This very action blatantly ignores the U.S. Supreme Court's repeated admonition that such late-hour disruptions should be scrupulously avoided. While the Supreme Court's decision in *Purcell*

---

that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues." (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959))).

*v. Gonzalez* certainly does not *prohibit* the federal judiciary from interceding close to elections to defend the Constitution, it advises federal courts to tread carefully when deciding whether to do so. *See* 549 U.S. 1, 5–6 (2006) (per curiam) (staying injunction due to "the imminence of the election and the inadequate time to resolve the factual disputes" in order to allow election to proceed with settled rules). Here, granting an injunction would inject confusion for administrators and voters. Even if Plaintiffs' constitutional claims were not woefully insufficient, the weight of recent precedent clearly demonstrates that an injunction would be inappropriate in this case.

Indeed, one need only look at the Supreme Court's election jurisprudence in the last eight months to see the Court's repeated warning to tread carefully close to elections. It has invoked this principle to stay remedial injunctions even when confronted with demonstrable constitutional violations caused by ballot receipt deadlines, *see Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020), and absentee ballot witness requirements, *see Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020). And, particularly relevant here, it has also affirmed district courts' decisions to stay their hands when asked to invalidate procedures announced by states' election officials. *See, e.g.*, *Moore v. Circosta*, No. 20A72, 2020 WL 6305036, at *1 (U.S. Oct. 28, 2020) (affirming district court's denial of injunction against consent decree entered by Secretary of State). While many of these decisions have been issued without opinions, those that have included the Justices' reasoning have emphasized that "federal courts ordinarily should not alter state election rules in the period close to an election." *Andino*, 2020 WL 5887393, at *1 (Kavanaugh, J., concurring). Plaintiffs' claims in this case certainly provide no basis for this Court to derogate from that frequently invoked principle.

## IV.    CONCLUSION

For these reasons, Intervenor-Defendants respectfully request that the Court deny Plaintiffs' emergency motion for temporary restraining order and preliminary injunction.

Dated: December 15, 2020.                    Respectfully submitted,

/s/ Joyce Gist Lewis                         jgeise@perkinscoie.com
Halsey G. Knapp, Jr.                         hbrewster@perkinscoie.com
Georgia Bar No. 425320
Joyce Gist Lewis                             Laura Hill**
Georgia Bar No. 296261                       Jonathan P. Hawley**
Adam M. Sparks*                              PERKINS COIE LLP
Georgia Bar No. 341578                       1201 Third Avenue, Suite 4900
KREVOLIN & HORST, LLC                        Seattle, Washington 98101
1201 W. Peachtree Street, NW                 Telephone: (206) 359-8000
Suite 3250, One Atlantic Center              lhill@perkinscoie.com
Atlanta, GA 30309                            jhawley@perkinscoie.com
Telephone: (404) 888-9700
Facsimile: (404) 888-9577                    Torryn Taylor Rodgers**
hknapp@khlawfirm.com                         PERKINS COIE LLP
jlewis@khlawfirm.com                         505 Howard Street, Suite 1000
sparks@khlawfirm.com                         San Francisco, California 94105
                                             Telephone: (415) 315-7000
Marc E. Elias*                               Facsimile: (415) 315-7050
Amanda R. Callais*                           trodgers@perkinscoie.com
John M. Geise*
Henry J. Brewster**                          Counsel for Intervenor-Defendants
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800          * Pro Hac Vice Application Granted
Washington, D.C. 20005                       **Pro Hac Vice Application Forthcoming
Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2020, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated: December 15, 2020                     /s/ Joyce Gist Lewis
                                             Joyce Gist Lewis
                                             Georgia Bar No. 296261