**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | |
|---|---|
| TWELFTH CONGRESSIONAL DISTRICT REPUBLICAN COMMITTEE; et al.,<br><br>      *Plaintiffs*,<br><br> v.<br><br>BRADFORD J. RAFFENSPERGER, in is official capacity as SECRETARY OF STATE OF GEORGIA, et al.,<br><br>      *Defendants*. | Civil Action No. 1:20-cv-00180-JRH-BKE |

**PROPOSED BRIEF OF PROPOSED INTERVENORS NAACP OF GEORGIA, ET AL.
IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1

## INTRODUCTION

In the midst of the ongoing January 2021 runoff election, months after they were aware of the allegations they assert this week, Plaintiffs ask this Court to eliminate hundreds of absentee ballot drop boxes currently operating across Georgia, rewrite Georgia's procedures for reviewing signatures for mail ballots, and change the date that canvassing starts.

As of December 14, 2020, more than 1,229,917 Georgia voters have requested absentee ballots and more than 260,000 voters have cast their absentee ballots in the January 5, 2021 runoff election.[1] More than 477,000 of those absentee ballots were requested by Georgia Black voters and other voters of color,[2] while at least 604,221 of these absentee ballots were requested by voters 66 years of age and older.[3] The astronomical absentee ballot figures are attributable at least in part to many voters' concerns about voting in person during the COVID-19 pandemic. As of December 13, 2020,[4] over 10,000 Georgians have died from the coronavirus, with Black Georgians and other persons of color having higher rates of hospitalizations and deaths from COVID-19 than white Georgians.[5] Under these circumstances, Georgia election officials are maintaining much of the same mail voting apparatus and mechanisms it employed for the November 2020 general election for the January 2021 runoff election, such as mail ballot drop boxes.

---

[1] U.S. Elections Project, *Georgia Early Voting Statistics - 2021 Senate Run-Off Election*, December 14, 2020, available at: https://electproject.github.io/Early-Vote-2020G/GA_RO.html.

[2] *Id.*

[3] *Id.*

[4] U.S. Centers for Disease Control COVID Data Tracker, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory* for Georgia, December 13, 2020, available at: https://covid.cdc.gov/covid-data-tracker/#trends_totalandratedeaths.

[5] U.S. Centers for Disease Control, *COVID-19 Hospitalization and Death by Race/Ethnicity*, updated November 30, 3030, available at: https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

Nevertheless, only now, Plaintiffs ask the Court for broad relief in several forms that, by their own admission, alternatingly imposes "arduous" burdens on election officials or, at best, are "somewhat disruptive" to the election administration process. Memorandum in Support of Preliminary Injunction, Dkt. 2 at 16. Plaintiffs assert these extreme remedies are necessary because Defendants' actions are somehow causing widespread "ballot harvesting" and other voting irregularities, which they do not attempt to substantiate, document, or describe beyond the most superficial and conclusory level possible. Understandably Plaintiffs do not attempt to support their vague, unfounded allegations of fraud, where numerous cases alleging similar improprieties in Georgia have been found to be baseless and bereft of supporting evidence.

Theoretical, speculative, and unsubstantiated fears do not support this Court's granting of any relief whatsoever, let alone the issuance of preliminary injunctive relief such as eliminating drop boxes in the middle of an election, which could disenfranchise numerous Georgians seeking to make their voice heard. Indeed, Plaintiffs' actions smacks instead of an effort to enjoin measures that boosted turnout in the November 2020 election and suppress mail voting in the January 2021 runoff election.

Plaintiffs' emergency motion is late, legally and factually baseless, and contrary to the bedrock values of our democracy. Proposed Intervenors Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, and Helen Butler therefore respectfully urge the Court to deny it.

I.    **FACTUAL BACKGROUND**

On November 18, 2020, registrars began mailing absentee ballots for the January 5, 2021 runoff election. *See* O.C.G.A. § 21-2-384. As Plaintiffs acknowledge, "[a]bsentee ballots are now being received by county election officials." Pl's Br., Dkt. 2, at 9. On November 23, 2020,

the Georgia State Election Board extended the emergency rule regarding drop boxes to cover the January 5 runoff election, Rule 183-1-14-0.6-.14.  Emil Moffatt, *Georgia Election Board Extends Rules Governing Drop Boxes, Early Ballot Processing*, WABE, Nov. 23, 2020, https://www.wabe.org/state-election-board-defends-georgia-election-extends-rules-governing-drop-boxes-early-processing/.  Shortly thereafter, counties around Georgia began setting up absentee ballot drop boxes around the state.  Michael King, *Where can you drop off your absentee ballot for the Jan. 5 Senate runoff election?*, 11Alive, Dec. 9, 2020, https://www.11alive.com/article/news/politics/elections/where-can-you-drop-off-absentee-ballots-for-georgia-senate-runoff/85-e428354c-90cf-458d-9980-8e8b48cdfa1f.  Advanced in-person voting for the January runoff election began on December 14, 2020.

On December 9, 2020, Plaintiffs filed the instant Emergency Motion for Temporary Restraining Order and Preliminary Injunction seeking immediate relief for the January runoff election.

## II.    PLAINTIFFS' EMERGENCY MOTION SHOULD BE DENIED

### A.    Plaintiffs Lack Standing Because They Bring a Generalized Grievance

Plaintiffs cannot obtain preliminary relief—and indeed cannot maintain suit—because their complaints about Defendants' processing of absentee ballots and usage of drop boxes are, at most, the kind of generalized grievance about government conduct that the Supreme Court has repeatedly found insufficient to confer Article III standing. "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance." *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004). To avoid dismissal on standing grounds, a plaintiff must show (1) an injury in fact, meaning "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury

4

and the defendant's conduct, and (3) a likelihood that the injury will be redressed by a favorable decision from the court. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Plaintiffs cannot demonstrate that they will suffer any injury absent the requested relief. Plaintiffs fail to allege that they will suffer an "actual or imminent" injury, as opposed to one that is merely "conjectural" or "hypothetical." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 409 (2013); *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). Plaintiffs' alleged injury rests solely on the unsupported assertion that purported state law violations cause "vote harvesting," which allegedly dilute Plaintiffs' legitimate votes, and the related "disparate treatment" that Plaintiffs allegedly "will experience when compared to the treatment accorded Democrat voters." Memorandum in Support of Preliminary Injunction, Dkt. 2 at 15-16; *see also* Declaration of Garland Moon, Dkt. 1, Ex. D ¶¶ 7-10 (asserting Twelfth District Republican Party needs to "identify and counter illegal harvesting activities").

The Plaintiffs base their standing on their interest in "assuring that vote fraud and other election misconduct is eliminated or at least minimized." Pl's Br., Dkt. 2 at 17. One of the Plaintiffs, Brian Tucker, asserts that "[t]he use of drop boxes . . . facilitates ballot harvesting by enabling individuals who are not relatives or members of the absentee voter [sic] to collect an absentee ballot and deposit it in a drop box, which is not attended or otherwise effectively monitored" and "I do not believe proper signature verification is taking place or that temporary poll workers are trained to verify the absentee envelope signatures." Declaration of Brian Tucker, Dkt. 2, Ex. A ¶¶ 4, 8. But Mr. Tucker, says that he plans to vote in person, *id*. ¶ 2, so the challenged provisions will not impact his vote. In fact, none of the plaintiffs plan to vote by mail, *see*

Complaint ¶¶ 17, so their votes are not impacted by the challenged provisions. Similarly, the Twelfth District Republican Party alleges that "Georgia Democrats and their allies, such as the New Georgia Project," engaged in "ballot harvesting" but Plaintiffs do not provide any evidence for that assertion, let alone any documentation to support the notion that Democrats are being advantaged, the Republican Party is being disadvantaged, or any Republican Party voters are being prevented from voting or are otherwise being harmed. Moon Decl., Dkt. 1, Ex. D ¶ 9.

Plaintiffs' arguments for standing mirror those that failed in *Wood v. Raffensperger*, --- F.3d ----, 2020 WL 7094866 (11th Cir. Dec. 5, 2020). The Eleventh Circuit's opinion in that case forecloses every one of Plaintiffs' standing arguments here. The *Wood* Court held that the plaintiff's asserted interest in "ensur[ing that] …. only lawful ballots are counted" and "requir[ing] that the government be administered according to the law" is a "generalized grievance." *Id*. at *4 (quoting *Chiles v. Thornburgh*, 865 F.2d 1197, 1205-06 (11th Cir. 1989)) (alteration adopted). Here, as in *Wood*, Plaintiffs "cannot explain how [their] interest in compliance with state election laws is different from that of any other person."

*Wood* is particularly instructive because Plaintiffs here are also alleging that legitimate votes will be diluted by purportedly illegal votes. Moon Decl., Dkt. 1, Ex. D ¶ 9 (saying ballot harvesting "results in the counting of illegal ballots [] which may alter the outcome of elections"). Beyond providing no evidence that any such dilution has occurred in the past or is at risk of happening in the future, Plaintiffs here fail to acknowledge that the Eleventh Circuit already held in *Wood* that "'no single voter is specifically disadvantaged' if a vote is counted improperly." *Id*. (quoting *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 356 (3d Cir. 2020)). Plaintiffs provide no evidence supporting the assertion that Democratic candidates or voters are benefiting

6

from the purported vote harvesting, rendering Plaintiffs' asserted vote dilution theory a "paradigmatic generalized grievance." *Id*.

For similar reasons, the *Wood* Court also rejected Plaintiffs' other theory of standing, which is "that Georgia "value[d] one person's vote over that of another" through "arbitrary and disparate treatment" benefiting absentee voters over in-person voters. *Id*. The Eleventh Circuit noted that "[e]ven if we assume that absentee voters are favored over in-person voters, that harm does not affect [the plaintiff] as an individual—it is instead shared identically by the four million or so Georgians who voted in person." *Id*.

Finally, Plaintiffs assert that *Roe v. Alabama ex rel. Evans*, 43 F.3d 574 (11th Cir. 1995), supports their standing, *see* Pl's Br. at 14. The *Wood* Court rejected that argument, too, noting that "no party raised and we did not did not address standing in *Roe*, so that precedent provides no basis for [the plaintiff] to establish standing." 2020 WL 7094866, at *5. The Court also noted that *Roe* was distinguishable because the voter-plaintiffs in that case "bore individual burdens—to obtain notarization or witness signatures if they wanted to vote absentee" – that distinguish it from more generalized grievances where a state "applie[s] uniform rules … to all voters." *Id*.

**B.    Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims**

Plaintiffs' lack of standing independently justifies denying the Emergency Motion. It also should be rejected because Plaintiffs have not shown that any of the alleged conduct by Defendants rises to the level of a violation of the U.S. Constitution.

**1.    Plaintiffs' Seek to Turn the *Anderson-Burdick* Test Inside-Out**

Plaintiffs' claim that their First and Fourteenth Amendment right to vote is violated by Defendants' decisions to provide for absentee ballot drop boxes and facilitate the counting of absentee ballots during the pandemic, *see* Pl's Br., Dkt. 2 at 11-13, turns settled principles of

7

constitutional law inside-out.  Plaintiffs here ask the Court to take measures in the midst of an ongoing election that would burden the rights of many absentee voters – for example those at risk of contracting COVID-19 who prefer to use a drop box rather than vote in person – even though Plaintiffs themselves plan on voting in person and are unaffected by the challenged provisions.  There is no precedent supporting Plaintiffs' argument that state actions making it *easier* for many voters to cast a ballot somehow unconstitutionally denies or dilutes the votes of individuals whose ability to vote is unaffected.

The foundational authorities for the *Anderson-Burdick* test, *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), protect against unnecessary restrictions on the right to vote.  The *Anderson-Burdick* test applies a sliding scale balancing the burden the state's restriction places on the right to vote against the state's interest justifying that burden.  See *Stein v. Alabama Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014) ("severe" restrictions on the right to vote "must be narrowly drawn to advance a state interest of compelling importance," but that a reasonable, nondiscriminatory restriction on voting rights is justified by a State's "important regulatory interests") (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

Here, Plaintiffs allege that there are two "burdens" placed on their right to vote: "vote dilution" caused by alleged widespread voter fraud, which Plaintiffs hypothesize would be made more prevalent by the facilitation of additional absentee voting, and "disparate treatment" of absentee voters vis-à-vis in person voters.  Plaintiffs' argument that these are legitimate burdens under *Anderson-Burdick* would render that framework virtually unrecognizable; the challenged provisions do not impede Plaintiffs or any other Georgian from voting but they do ease the burden of voting by mail on other voters.  See *Wood*, 2020 WL 7094866, at *5 (distinguishing

8

"the burden to produce photo identification" as a form of injury from a generalized grievance like the one suffered by Wood). Plaintiffs' claim is therefore entirely novel; *Anderson-Burdick* and their progeny have been applied *only* to enjoin state laws or procedures that have the effect of *restricting* the right to vote or limiting someone's access to the ballot.[6] No court applying the *Anderson-Burdick* doctrine has even hinted that the U.S. Constitution can be used to enjoin state action that *increases* access to the ballot and does not restrict the right to vote. Here, Plaintiffs' relief increases the burdens on voters such as the proposed Defendant-Intervenors and their members, thereby tilting the balance of the equities decidedly away from Plaintiffs.

As a matter of law, the Motion—which does not demonstrate any concrete or specific instances of fraud, systemic or otherwise—cannot support the extreme relief requested. Even if Plaintiffs' allegations were proven (they are not) and there were isolated, sporadic incidents in which the election laws were violated by election workers or officials, this occurrence could not possibly justify wide-scale disenfranchisement of Georgians and thereby violating the U.S. Constitution by burdening the right to vote. *See Ne. Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 595, 597-98 (6th Cir. 2012) (holding that rejecting ballots invalidly cast due to poll

---

[6] *See, e.g.*, *Dem. Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321-22 (11th Cir. 2019) (finding absentee ballot statute imposes "at least a serious burden" on voters and fails to satisfy *Anderson-Burdick*); *Ga. Coal. For the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (finding "severe burdens" on voting); *Ga. Coal. For the People's Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016) ("administrative hurdles pale in comparison to the physical, emotional, and financial strain Chatham County residents faced in the aftermath of Hurricane Matthew"); *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993) (holding the public disclosure of voters' Social Security Numbers on their voter records "substantially burdened" the right to vote); *Ne. Ohio Coal. For Homeless v. Husted*, 696 F.3d 530, 593 (6th Cir. 2012); *Mullins v. Cole*, 218 F. Supp. 3d 488, 493 (S.D. W.Va. 2016) (finding a "severe" burden where "the ease of registering to vote using the online registration system has been denied to over 4,500 Cabell County residents"); *Common Cause N.Y. v. Brehm*, 432 F. Supp. 3d 285, 314 (S.D.N.Y. 2020) (finding New York's "prohibition on providing the inactive list burdens its voters" and does not withstand scrutiny under *Anderson-Burdick*).

9

worker error likely violates due process). Far from curing any constitutional violation, the Plaintiffs' requested injunction would *create* grave constitutional violations. This is a classic case in which "the cure [is] worse than the alleged disease, at least insofar as the professed concern is with the right of voters to cast effective ballots in a fair election." *Baber v. Dunlap,* 349 F. Supp. 3d 68, 76 (D. Me. 2018).

Finally, even if Plaintiffs' allegations could support a finding of some sort of error in election administration under state law, they have come to the wrong venue. The Eleventh Circuit has observed that "[i]n most cases, irregularities in state elections are properly addressed at the state level, whether through state courts or review by state election officials." *Burton v. State of Ga.,* 953 F.2d 1266, 1268 (11th Cir. 1992).

### 2. No Valid Constitutional Claim Arises From Georgia's May 1, 2020 Official Election Bulletin That Stems From A Settlement Agreement

Plaintiffs base their request for emergency injunctive relief in part on the May 1, 2020 Official Election Bulletin issued by Georgia Elections Director Chris Harvey after state officials entered into a settlement agreement with the Democratic Party of Georgia in *Democratic Party of Ga., Inc. v. Raffensperger*, No. 1:19-cv-05028-WMR (N.D. Ga.). Contrary to Plaintiffs' arguments, neither the Official Election Bulletin nor the Settlement Agreement re-write or defy any election laws on the handling of absentee ballots. In fact, Judge Grimberg rejected a challenge to the Official Election Bulletin and the Settlement Agreement in the *Wood* case. *See Wood v. Raffensperger*, 2020 WL 6817513, at *3 (N.D. Ga. Nov. 20, 2020) (noting that "[a]s part of the Settlement Agreement, Raffensperger agreed to issue an official Election Bulletin containing certain procedures for the review of signatures on absentee ballot envelopes by county election officials"), *aff'd on other grounds*, 2020 WL 7094866 (11th Cir. Dec. 5, 2020). The district court

10

rejected the plaintiff's *Anderson-Burdick* argument, holding that his "equal protection claim does not fit within this framework." *Id*. at *9. For good measure, the court added that "[e]ven if [the] claim were cognizable in the equal protection framework, it is not supported by the evidence at this stage" because there was no evidence that "invalid ballots were passed over and counted improperly." *Id*. at *10.

Plaintiffs' argument is fundamentally flawed because it misconstrues the relevant Georgia law and what election officials are doing to verify signatures on absentee ballot envelopes pursuant to the Official Election Bulletin. Plaintiffs first falsely assert that "O.C.G.A. § 21-2-386(a)(1)(B) provides that the signature on the absentee ballot envelope must match the signature on the voter's registration card **and** the signature on the voter's application for an absentee ballot." Pl's Br., Dkt. 2, at 9 (emphasis in original). Georgia's signature verification statute provides that, upon receiving an absentee ballot, "[t]he register or clerk shall compare the signature or mark on the oath with the signature or mark on the absentee elector's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot" and "shall if the information and signature appear to be valid . . . so certify by signing or initialing his or her name below the voter's oath." O.C.G.A. § 21-2-386(a)(1)(B). .

Second, Plaintiffs err when they assert that the Official Election Bulletin permits county election officials to compare signatures to *either* the signature on file with the eNet system *or* on the absentee ballot application. *See id*. According to the Official Election Bulletin, *see* Dkt. 1, Ex. C, if a county registrar or clerk were to determine a signature did not match the elector's signature "contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot," the Election Bulletin directed that "two other registrars, deputy registrars, or absentee ballot clerks" evaluate the signature. *Id*. If a majority of

11

the reviewers determined the signature did not match "any of the voter's signatures on file in eNet or on the absentee ballot application," the absentee ballot was to be rejected. *Id.*

### C. Plaintiffs' Claims With Respect to Signature Matching and the May 1, 2020 Official Election Bulletin are Barred by Laches for the January 2021 Runoff

The doctrine of laches applies in the elections context to avoid gamesmanship in the middle of election that Plaintiff seeks to accomplish here. Plaintiff has plainly (1) "delay[ed] in asserting a right or a claim," (2) lacks an excuse, and (3) that delay would result in undue prejudice with respect to the January 2021 runoff election. *See United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005) (setting out the laches factors); *see also Amtrak v. Morgan*, 536 U.S. 101, 121-22 (2002) (laches "bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant"); *Costello v. United States*, 365 U.S. 265, 282 (1961); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986); *Plyman v. Glynn Cty.*, 578 S.E.2d 124, 126 (Ga. 2003) (Georgia law).

A district court has already held that the plaintiff's challenge to the signature-match settlement agreement and Official Election Bulletin is barred by laches with respect to the November 2020 general election, let alone the January 2021 runoff. *See Wood*, 2020 WL 6817513, at *7 (holding that plaintiff's "claims regarding the Settlement Agreement" are "barred by the doctrine of laches"), *aff'd on other grounds*, 2020 WL 7094866 (11th Cir. Dec. 5, 2020). The court found that there was undue delay because the May 1, 2020 Official Election Bulletin resulted from a settlement agreement was entered into and made public in March 2020, ten months before the January 2021 runoff election and has already been in effect for three elections during the 2020 election cycle. *Id*. The *Wood* court further observed that there is no excuse for challenging

12

Georgia's signature matching procedures because those claims "were ripe the moment the parties executed the Settlement Agreement."  *Id.*

A challenge to election procedures should be brought when there is still time to correct those procedures.  *See Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration and Elections*, 446 F. Supp. 3d 1111, 1126-27 (N.D. Ga. 2020) ("Plaintiffs were not faced with a binary choice and should have sought court intervention sooner."); *see also Republican Party of Pa. v. Cortes*, 218 F. Supp. 3d 396, 404-05 (E.D. Pa. 2016) (declining to enjoin aspects of Pennsylvania's poll-watcher statute in case filed "eighteen days before the election," observing that "Plaintiffs unreasonably delayed filing their Complaint and Motion, something which weighs decidedly against granting the extraordinary relief they seek").

By waiting until absentee voting for the January 2021 election is well underway, Plaintiffs have ensured that "Defendants, Intervenors, and the public at large would be significantly injured if the Court were to excuse" Plaintiffs' delay here.  *Wood*, 2020 WL 6817513, at *7.  Absentee ballot drop boxes have already been set up across Georgia, voters have cast absentee ballots, and election officials are reviewing absentee ballot envelopes.  Members of the Defendant-Intervenor organizations, many of whom used absentee ballot drop boxes for past elections, have already used drop boxes to drop off their mail ballot for the January 2021 runoff election.  *See* Declaration of James Woodall ¶ 15.  Other voters are planning to deliver their mail ballots to a drop box but have not yet done so.  *Id*.  Under these circumstances, it is no stretch to conclude that "[b]eyond merely causing confusion, [the] requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process."  *Wood*, 2020 WL 6817513, at *8.

Even assuming *arguendo* that there were problems with the conduct of the January 2021 runoff election and that any such conduct gave rise to constitutional concerns, if Plaintiff had

timely asserted these claims, Defendants would have had the opportunity to address the concern. But having sat on their objections for more than seven months since the issuance of the May 1, 2020 Official Election Bulletin, laches now bars Plaintiffs' claims with respect to the 2021 election.

## CONCLUSION

For all of these reasons, Proposed Interveners respectfully urge the Court to deny Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

Dated:   December 15, 2020                     Respectfully submitted,


                                                    By: */s/ John P. Batson*
                                                       John P. Batson
                                                       Ga. Bar No. 042150
                                                       1104 Milledge Road
                                                       Augusta, GA 30904
                                                        Phone 706-737-4040
                                                       FAX 706-736-3391
                                                       jpbatson@aol.com


[SIGNATURES CONTINUE NEXT PAGE]

```
```

*/s/ Ezra Rosenberg*
Kristen Clarke*
kclarke@lawyerscommittee.org
Jon M. Greenbaum*
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg*
erosenberg@lawyerscommittee.org
Julie M. Houk*
jhouk@lawyerscommittee.org
John Powers*
jpowers@lawyerscommittee.org
Kevin M. Benedicto
kbenedicto@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8300

\* *Pro hac vice* motion forthcoming

*Attorneys for Proposed Defendant-Intervenors Georgia State Conference of the NAACP, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: December 15, 2020.

> /s/ *John P. Batson*
> John P. Batson
> Ga. Bar No. 042150
> 1104 Milledge Road
> Augusta, GA 30904
> Phone 706-737-4040
> FAX 706-736-3391
> jpbatson@aol.com